295 S.E.2d 16

**John and Martha McFOY, et al., etc.**

**v.**

**AMERIGAS, INC.**

**No. 15314.**

Supreme Court of Appeals of West Virginia.

July 1, 1982.

Rehearing Denied Sept. 16, 1982.

William H. Higinbotham and Thomas A. Vorbach, Morgantown, for appellant.

Allan N. Karlin, Morgantown, for appellees.

NEELY, Justice:

This is an appeal from a partial summary judgment entered by the Circuit Court of Monongalia County against the defendant below, Amerigas, Inc. and in favor of the

plaintiffs, John and Martha McFoy and others, who sue both individually and as representatives of a class of all others similarly situated. The plaintiffs alleged that certain billing and collection practices of the defendant, Amerigas, violated *W. Va. Code*, 46A–6–104 [1974]. The circuit court agreed with the plaintiffs and entered summary judgment against Amerigas on the underlying liability. The court then ordered that further proceedings be conducted to determine the members of the plaintiff class and the amount of damages. The defendant contends on appeal that the circuit court improperly awarded summary judgment against it and that the membership of the class of plaintiffs should have been ascertained before the determination of liability under Rule 23, *W. Va. R.C.P.* We find that the circuit court was wrong in granting summary judgment and we reverse.

The defendant, Amerigas, Inc., is a corporation that sells liquid propane gas in a market area that includes Monongalia County. Amerigas delivers liquid propane gas (LP gas) by truck to tanks owned by Amerigas that are installed on the property of its customers, most of whom live in remote areas where normal gas service is unavailable. Some of the plaintiffs are currently customers of Amerigas and other plaintiffs are former customers of Amerigas.

Before a customer may receive service, Amerigas requires that the customer execute an application for service agreement which sets forth the conditions of the service contract. One provision of the application for service used by Amerigas contains the following language:

> 5. The schedule of rates and minimum usage requirements applicable hereunder shall be those prevailing at the time of sale within the price territory established by the Company [Amerigas] in which the installation is located....

The purpose of the minimum usage requirement is to compensate Amerigas for use and depreciation of the equipment installed on the customer's premises. A minimum use charge is billed to the customer if the customer does not consume a minimum amount of LP gas in a calender year. Plaintiff Marilyn H. Byrne executed an application on 7 October 1976. Mr. and Mrs. Byrne then received a bill in March, 1978 for a minimum charge incurred in 1977. According to the Byrnes, the bill charging them for minimum annual use received in March 1978 was the first time they had knowledge of a minimum usage requirement, and the Byrnes did not pay the charge as billed by Amerigas.

Plaintiff Martha McFoy executed an application on 14 December 1971 and plaintiffs John McFoy and Martha McFoy also received a bill for a minimum annual charge in March 1978. According to Mr. and Mrs. McFoy, they also had no knowledge of a minimum usage requirement until the March 1978 minimum usage charge was received. The McFoys paid the bill as submitted by the company.

Another provision of the application for service used by Amerigas contains the following language:

> 9. Upon default of the terms hereof, the buyer [Plaintiffs] grants the Company [Amerigas] the right to enter on the premises and retake such equipment herein loaned, without notice....

The equipment located on a customer's property in which the LP gas is stored, and by which LP gas service is provided, is owned by Amerigas. The actual LP gas service is controlled or regulated by a gas regulator, the removal or blockage of which immediately stops the LP gas service.

Plaintiff Martha McFoy stated that she contacted Amerigas in March, 1978 and requested that Amerigas halt further LP gas deliveries to her home. In April 1978 the McFoys were returning to their home and discovered one of Amerigas' employees filling their LP gas tank. Martha McFoy informed the employee that she did not want the LP gas and could not pay for it. Amerigas' employee removed the regulator from the McFoys' LP gas tank which immediately stopped any further use of the LP gas contained in that tank. The McFoys have not paid for the LP gas con-

tained in the tank, and the tank remains on the McFoys' property. The McFoys did not use the LP gas for heating purposes, but employed it only as fuel for their artificial fireplace in the living room.

Upon motions made by the plaintiffs, the circuit court awarded the plaintiffs partial summary judgment. The circuit court held as a matter of law that there was no contractual agreement concerning any minimum usage charge and that billing such a charge was an unfair and deceptive act under *W. Va. Code*, 46A–6–104 [1974], which provision is part of the *West Virginia Consumer Credit and Protection Act.* The circuit court ordered Amerigas to return all minimum usage charges collected by it to the entire class of plaintiffs and awarded damages. The circuit court also held as a matter of law that the removal of the McFoys' regulator was an abusive debt collection practice prohibited by *W. Va. Code*, 46A–2–124 [1974] and an unfair and deceptive act under *W. Va. Code*, 46A–6–104 [1974]. The circuit court enjoined Amerigas from removing regulators and awarded damages.

The circuit court also certified classes of plaintiffs for further proceedings in the action and ordered that notice of the pending action be given to the class of potential plaintiffs by mail and by newspaper publication and that Amerigas pay the mailing expenses.

## I

■ Chapter 46A of the *W. Va. Code* has not been interpreted extensively by this Court since its passage in 1974. The section under which this lawsuit is brought, namely *Code*, 46A–6–104 [1974] is among the most broadly drawn provisions contained in the Consumer Credit and Protection Act and it is also among the most ambiguous. That section provides:

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

The Legislature, however, has given broad guidelines to the courts concerning the proper interpretation of *Code* 46A–6–104 [1974] in *Code*, 46A–6–101 [1974]:

(1) The legislature hereby declares that the purpose of this article is to complement the body of federal law governing unfair competition and unfair, deceptive and fraudulent acts or practices in order to protect the public and foster fair and honest competition. It is the intent of the legislature that, in construing this article, the courts be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters. To this end, this article shall be liberally construed so that its beneficial purposes may be served.

(2) It is, however, the further intent of the legislature that this article shall not be construed to prohibit acts or practices which are reasonable in relation to the development and preservation of business or which are not injurious to the public interest,...

Consequently, it should be apparent that whenever a trade practice is challenged under the provisions of 46A–6–104 [1974] the lawfulness of the challenged practice must be measured by whether that activity was "reasonable in relation to the development and preservation of business...."

■ In the case before us there is nothing so inherently unreasonable or deceptive in the alleged activities of Amerigas as to warrant a finding of liability as a matter of law. At best, even if all of the allegations of the plaintiffs are taken as true, a jury question is presented. Amerigas quite reasonably maintains that the equipment installed upon the property of its customers is valuable and that the servicing of that equipment, involving as it does the employment of trucks and drivers to determine the amount of gas used and to refill the tanks, is expensive. It appears from the record that the minimum usage charge established by Amerigas and applicable to the plaintiff customers and former customers was $200 per year, which was a credit against gas actually used. While a person using LP gas exclusively for decorative purposes might use less than $200 worth of gas a year, certainly no customer using LP

gas for heat, cooking, and hot water would ever be subjected to a minimum usage charge of $200.

The thrust of plaintiffs' complaint is that Amerigas deceived plaintiffs by failing to inform them that there was a minimum usage charge. In response, Amerigas has presented uncontested documentary evidence that plaintiffs signed applications for service that included reference to a minimum usage charge. The problem with Amerigas' application for service is that the minimum usage charge is open-ended; Amerigas did not explicitly inform its customers on the face of the application of the exact amount of the minimum usage charge. Nonetheless, Amerigas did explain to its customers in the paragraph discussing minimum usage that the rate would be equal and uniform among all customers and would be "those prevailing at the time of sale within the price territory established by the company in which the installation is located..." Thus Amerigas promised a primitive form of equal protection.[1]

The application for service that is contained in the record in this case has numerous provisions; however, the minimum usage requirement is set forth in exactly the same typeface as provisions on other subjects and is in no way hidden or obscured. Furthermore, Amerigas' case would be compelling if they can prove, as they have offered to do, that all the customers who constitute the plaintiff class had notice that there was a minimum usage requirement and also knew what the requirement was at the time of installation. Certainly, if Amerigas made known to its customers the terms and conditions under which it supplied gas through any reasonable oral or written means, then its charges in this regard could not possibly be characterized as "deceptive."

The plaintiffs, Mr. and Mrs. McFoy, assert that Amerigas' removal of the regulator from their LP gas tank constituted an abusive debt collection practice under *Code*, 46A-2-124 [1974];[2] however, Amerigas asserts that Mr. and Mrs. McFoy informed their agent that they no longer wished to be served by Amerigas. If it is

---

1. We would have a different case if Amerigas, without notice, began to exact an outrageous, although uniform, minimum usage charge.

2. *Code*, 46A-2-124 says:

No debt collector shall collect or attempt to collect any money alleged to be due and owing by means of any threat, coercion or attempt to coerce. Without limiting the general application of the foregoing, the following conduct is deemed to violate this section:

(a) The use, or express or implicit threat of use, of violence or other criminal means, to cause harm to the person, reputation or property of any person;

(c) False accusations made to another person, including any credit reporting agency, that a consumer is willfully refusing to pay a just debt, or the threat to so make false accusations;

(d) The threat to sell or assign to another the obligation of the consumer with an attending representation or implication that the result of such sale or assignment would be that the consumer would lose any defense to the claim or would be subjected to harsh, vindictive or abusive collection attempts;

(e) The threat that nonpayment of an alleged claim will result in the:

(1) Arrest of any person; or

(2) Garnishment of any wages of any person or the taking of other action requiring

judicial sanction, without informing the consumer that there must be in effect a judicial order permitting such garnishment or such other action before it can be taken; and

(f) The threat to take any action prohibited by this chapter or other law regulating the debt collector's conduct.

*Code*, 46A-2-125 says:

No debt collector shall unreasonably oppress or abuse any person in connection with the collection of or attempt to collect any claim alleged to be due and owing by that person or another. Without limiting the general application of the foregoing, the following conduct is deemed to violate this section:

(a) The use of profane or obscene language or language that is intended to unreasonably abuse the hearer or reader;

(b) The placement of telephone calls without disclosure of the caller's identity and with the intent to annoy, harass or threaten any person at the called number;

(c) Causing expense to any person in the form of long distance telephone tolls, telegram fees or other charges incurred by a medium of communication; and

(d) Causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously, or at unusual times or at times known to be inconvenient, with intent to annoy, abuse, oppress or threaten any person at the called number.

true that Mr. and Mrs. McFoy no longer wanted gas service, Amerigas was certainly justified in declining to serve them. We would almost conclude as a matter of law that failing to provide a good or service on a continuing basis to customers who both maintain that they do not want the good or service and decline to pay for such good or service is not an unfair or abusive debt collection practice.

## II

█ We now come to the question of whether the circuit court was correct in determining the question of liability before it defined the class of plaintiffs. Where the factual circumstances of a case make it appropriate to determine liability before determining the class of plaintiffs, it is within the court's discretion to do so. The applicable requirement under the Federal Rules is that determination of class standing be made "as soon as practicable after the commencement of the action," Rule 23(c)(1), *Fed. R. Civ. P.* (1966). The Third Circuit, Sixth Circuit and District of Columbia Circuit have all allowed the trial court to make its class action determination at the entry of final judgment, or after. *McLaughlin v. Wohlgemuth*, 535 F.2d 251 (3rd Cir., 1976); *Larinoff v. U. S.*, 533 F.2d 1167, U.S. App. D.C. (1976), *aff'd*, 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); *Alexander v. Aero Lodge No. 735, Int'l. Ass'n. of Machinists and Aerospace Workers, AFL–CIO*, 565 F.2d 1364 (6th Cir., 1977), *cert. denied*, 436 U.S. 946, 98 S.Ct. 2849, 56 L.Ed.2d 787 (1978). We find this flexibility reasonable so long as the defendant is aware that a determination of class action standing is a distinct possibility.

█ In this case Amerigas was on notice that the plaintiffs were seeking to pursue their claim with a class action suit. Furthermore, the issue of liability is separable here from the question of which customers properly are members of the plaintiff class, or the issue of whether there actually is a plaintiff class. If the trade practices of Amerigas are abusive, unfair, or deceptive under *W. Va. Code*, Section 46A, they are no more or less abusive or deceptive because the plaintiff class consists of one or one thousand members. Were the determination of class standing to affect the underlying liability, however—for instance had a pattern of conduct needed to be proven to establish the underlying wrong—then the court could not address the issue of liability without establishing the class of plaintiffs. Since this is not the case here we have no objection to the court below determining liability before class standing. This decision is in harmony with the Third Circuit's tactic in *Katz v. Carte Blanche Corp.*, 496 F.2d 747 (1974) (en banc), *cert. denied*, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974) that permitted plaintiffs to proceed in a test case and move, if successful, for later consideration of class certification, and also with the general federal practice that permits plaintiffs to "amend up" to a class complaint. *Battle v. Cherry*, 339 F.Supp. 186, n. 1 (N.D.Ga. 1972); *Harris v. Louisiana State Supreme Court*, 334 F.Supp. 1289 (E.D.La. 1972); *Joseph v. House*, 353 F.Supp. 367 (E.D.Va.1973) (class denied); *Burney v. North American Rockwell Corp.*, 302 F.Supp. 86 (C.D.Ga.1969); *Carter v. Holt-Williamson Mfg. Corp.*, 62 Lab.Cas. 9436 (E.D.N.C.1969); *Hicks v. Crown Zellerbach Corp.*, 49 F.R.D. 184 (E.D.La.1969).

## III

█ The present case also raises the question whether a judicial determination of class standing is an appealable order. This Court held in syl. pt. 6 of *Mitchem v. Melton*, 167 W.Va. 21, 277 S.E.2d 895 (1981):

> An order denying class action standing under Rule 23 of the West Virginia Rules of Civil Procedure may be appealed by the party who asserts such class standing.

It would appear a logical corollary of this rule that an order awarding class action standing is also appealable.

Yet it is clearly not the rule that an order awarding class action standing is appealable; the likelihood that defendants will appeal any order authorizing class actions, regardless of merit, merely for the purpose of delay, has prompted the federal courts

to be unsympathetic to appeals of class action standing as a matter of course. The Second Circuit has elaborated on the conditions which must be present to permit an appeal of a decision awarding such standing in *Kohn v. Royall, Koegel and Wells,* 496 F.2d 1094 (2nd Cir. 1974). The first condition is that the favorable determination of class standing must be fundamental to the further conduct of the case. This condition is, in effect, an inverse application of the "death knell" doctrine; if reversal of an order granting class standing would for all practical purposes put an end to the action, then the "fundamental to the further conduct of the case" condition is satisfied.

The second federal requirement to justify an appeal is that the issue contested must also be separable from the merits of the case, in the sense that it would be unlikely to resurface on appeal. An example of this is an objection to a court's procedural order which would be mooted by obedience to that order. The third and final requirement is of irreparable harm to a party. The Second Circuit stated that "[j]udicial efficiency requires that appellate review be made before the parties and district courts have spent considerable time, effort and money on such actions," *Herbst v. International Telephone and Telegraph, Corp.,* 495 F.2d 1308, at 1313 (2nd Cir. 1974). In order to prevent the waste of these resources in an expensive class action defense, an appeal of class action standing may be granted before the trial goes on if all three of these conditions are met.

We find the reasoning of the Second Circuit persuasive insofar as it outlines the important factors to consider before granting review of a class standing award, but we find it unnecessary to imitate their method of review. Writs of prohibition offer a procedure in West Virginia preferable to an appeal for challenging an improvident award of class standing. In the case of *Natural Gas Co. v. Sommerville,* 113 W.Va. 100, 166 S.E. 852 (1932) this Court allowed a writ of prohibition to test the correctness under old equity practice of

the trial court's finding that a class action could be maintained.

■ Our modern practice is to allow the use of prohibition, based on the particular facts of the case, where a remedy by appeal is unavailable or inadequate, or where irremediable prejudice may result from lack of an adequate interlocutory review. *State ex rel. Williams v. Narick,* 164 W.Va. 632, 264 S.E.2d 851 (1980). The congruence of the substantive standard of "irreparable harm" pronounced by the Second Circuit and our procedural standard of "irremediable prejudice" for allowing a writ of prohibition stands as evidence of the propriety of such writs to review improvident awards of class action standing.

It is also interesting to note that the Second Circuit's test concerning the "extraordinary" circumstances under which an order awarding class action standing becomes appealable closely parallels our requirements under *Hinkle v. Black,* 164 W.Va. 112, 262 S.E.2d 744 (1979) stating that this Court will issue a writ of prohibition to avoid "substantial, clear-cut, legal errors plainly in contravention of a clear statutory, constitutional, or common law mandate which may be resolved independently of any disputed facts and only in cases where there is a high probability that the trial will be completely reversed if the error is not corrected in advance." *Hinkle, supra,* Syl. pt. 1.

The application of the procedure is facilitated, happily, by our recent decision in *Hinkle v. Black, supra,* which provides concise guidance in the use of prohibition. The trial court can proceed at a rapid pace to litigate the whole case, and its progress is not impeded unless the defendant's lawyers prepare a petition showing this Court why it should intervene and permit a challenge to the class action standing. Frivolous cases are filtered out at the point where the defendant asks this Court for a rule to show cause, and meritorious cases can be set on the docket the following term. *Mirabile contemplatu,* a vehicle for the appeal of meritorious cases appears that confounds efforts to delay, for delay's

sake, cases where the award of class action standing has been proper.

## IV

The circuit court concluded as a matter of law that there was no contract authorizing the imposition of a minimum usage fee and that the removal of regulators to induce payment of back bills was an abusive debt collection practice prohibited by *Code,* 46A–2–124 and 125 [1974]. Based upon the court's determination of the defendant's liability as a matter of law the Court then certified a class consisting of:

All parties who are currently LP gas customers of the defendant or who were LP gas customers of the defendant within the period beginning two years prior to the date of filing of this action and continuing to the present and who have: (a) paid in or been assessed a "minimum annual charge" by the defendant and/or (b) been adversely affected by: (1) the removal of regulators; or (2) inability to take advantage of the lower "net charge" due to delays in the receipt of bills from the defendant.

■ If the court's conclusions concerning liability as a matter of law had been correct, then the certification of this broad class would probably have been correct as well. Since, however, the minimum usage fee is not *per se* unreasonable and may lawfully be exacted from customers if Amerigas gave reasonable notice of its policy concerning minimum usage fees, not all customers who paid such a fee are necessarily entitled to a refund.

■ Allegations were also made that Amerigas engaged in unlawful collection practices by removing the regulators from tanks when there was some gas in the tank for which the customer had already paid. Where customers were not permitted to enjoy the use of gas for which they had already paid they have a valid complaint; however, where further use of gas for which payment had not been received was interdicted, the company was within its rights, absent any abusive behavior. Con-

sequently, both the issue of actual notice of minimum usage charges and the extent to which customers had been prevented from using gas for which they had paid required factual determinations concerning each individual customer unless a common pattern applicable to all customers could have been established before a jury.

Since we have determined that the circuit court's award of summary judgment was improper, we need not explore in any depth the propriety of the court's order requiring Amerigas to pay for notice. If the court had been correct in its award of summary judgment, and its decision either was not appealed or was sustained on appeal, then the court's action requiring the costs of rendering complete relief to be borne by the losing party would have been proper.

In general, class actions are a flexible vehicle for correcting wrongs committed by large-scale enterprise upon individual consumers, and a court has wide discretion to award attorneys' fees and costs. However, it is still axiomatic that plaintiffs must prove their case before they can get into the pocket of the defendant. There is authority for a prejudgment seizure of the defendant's property only in very limited circumstances, and never merely for the purpose of subsidizing the presentation of the plaintiff's case.

■ Plaintiffs normally must finance notice in the first instance, and the court then assesses this expense against the defendant if the defendant does not prevail at trial. In an early case, *Berland v. Mack*, 48 F.R.D. 121 (S.D.N.Y.1969) the court held that facilitating class actions, though an admirable endeavor, should not go so far as to authorize a rule financing them out of corporate coffers. However, the court went on to say that allocation of notice costs was an appropriate area for exercise of judicial discretion. Although some cases have looked to a vast multiplicity of factors to determine whether costs may be exacted from the defendant in advance,[3] the weight of authority is that if a fiduciary relationship between the parties exists, or if a

---

3. *Lamb v. United Security Life Co.,* 59 F.R.D. 25 (S.D.Ia.1972). *See also Berland v. Mack, supra.*

*prima facie* case has been made against the defendant,[4] the defendant may be required to advance notice costs. The rule is not specific; these are just conditions which, if present, strongly suggest that no injustice will be done by directing the defendant to pay. In this context, appropriate factors to consider include the merit of the claim, the cost of notice, the ability of the plaintiffs to pay, or to reimburse should they not prevail, and the importance of class *res judicata* effects to the parties. *Berland v. Mack, supra;* H.B Newberg, *Newberg on Class Actions,* vol. 2, § 2375 (1977). Since the class action is largely a procedure to enable suits to be brought that would otherwise die because the transactional costs would exceed individual judgments, notice costs should be allocated to facilitate resolution of the class suit. However, before a court can require a defendant to finance the plaintiffs' case in advance of judgment, it must appear with reasonable certainty that the ends of justice are served and that no irremediable damage will be visited on the defendant. The likelihood of a judgment for the plaintiff must be great enough that the weight in terms of overall equity of going forward out of the defendant's pocket overwhelms the burden to the defendant of those costs.

■ Had the award of summary judgment below been correct, the trial court would not have exceeded its legitimate powers in allocating notice costs to the defendant. Since, however, the summary judgment was improper, no *prima facie* case of liability exists that will justify an exaction of costs in advance. By the plaintiff's own admission the members of the affected class are largely the rural poor, so the defendants are unlikely to be reimbursed if they ultimately prevail either before a jury or on appeal. They will then have paid not only for the presentation of their own case with all of its attendant expenses, but for a substantial part of the presentation of the plaintiffs' case. The circuit court's order requiring that defendant pay for notice to potential plaintiffs consequently cannot be allowed to stand. Plaintiffs must give notice to the class at their own expense.

Accordingly, for the reasons set forth above the judgment of the Circuit Court of Monongalia County is reversed and the case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

---

4. The existence of a *prima facie* case militates in favor of requiring the defendant to pay notice costs, increasingly so the greater the likelihood of a plaintiff victory. The Supreme Court's decision in *Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) disapproving "mini-hearings" on the merits in connection with the class action determination and the allocation of notice costs must be seen as a rejection of the procedure involved, and not of the sensible theory the disapproved procedure was designed to implement. It therefore remains within the discretion of the trial judge to take into account in determining this allocation the likelihood of the plaintiff emerging victorious. Where the pleadings and discovery make a *prima facie* case for the plaintiff, and absent any other indications that an injustice would thereby be done the defendant, the defendant can properly be required to bear the initial cost of notice. If the class action suit would not go forward otherwise, the defendant *should* be required to bear that cost.