618 S.E.2d 582

**STATE of West Virginia ex rel. Darrell V. McGraw, Jr., Attorney General, Plaintiff**

v.

**BEAR, STEARNS & CO., INC.; Citigroup Global Markets, Inc. (FKA Salmon Smith Barney, Inc.); Credit Suisse First Boston LLC; Goldman, Sachs & Co.; Lehman Brothers, Inc.; Merrill Lynch; J.P. Morgan Securities, Inc., Morgan Stanley & Co., Inc.; UBS Warburg, LLC; and U.S. Bancorp Piper Jaffray, Inc., Defendants**

No. 32515.

Supreme Court of Appeals of West Virginia.

Submitted June 8, 2005.

Decided July 7, 2005.

Concurring and Dissenting Opinion of Justice Starcher July 12, 2005.

---

Darrell V. McGraw, Jr., Esq., Attorney General, Frances H. Hughes, Esq., Chief Deputy Attorney General, Silas B. Taylor, Esq., Senior Deputy Attorney General, Charleston, West Virginia, R. Edison Hill, Esq., James C. Peterson, Esq., Hill, Peterson, Carper, Bee & Deitzler, Charleston, West Virginia, Barry Hill, Esq., Teresa Clark Toriseva, Esq., Hill, Toriseva & Williams, Wheeling, West Virginia, Rudolph L. DiTrapano, Esq., Sean McGinley, Esq., Joshua I. Barrett, Esq., DiTrapano, Barrett & DiPiero, Charleston, West Virginia, Marvin W. Masters, Esq., Masters & Taylor, Charleston, West Virginia, for Plaintiff.

Rebecca A. Betts, Esq., Bryant J. Spann, Esq., Allen, Guthrie, McHugh & Thomas, Charleston, West Virginia, Attorneys for Bear, Stearns & Lehman Bros.

Thomas R. Goodwin, Esq., Susan Wittemeier, Esq., Raymond S. Franks, II, Esq., Goodwin & Goodwin, Charleston, West Virginia, Attorneys for Citigroup Global Markets.

David Allen Barnette, Esq., Jackson Kelly, Charleston, West Virginia, Attorney for Credit Suisse First Boston.

John H. Tinney, Esq., The Tinney Law Firm, Charleston, West Virginia, for Goldman Sachs.

Charles M. Love, III, Esq., P. Michael Pleska, Esq., Bowles Rice McDavid Graff & Love, Charleston, West Virginia, Attorneys for Merrill Lynch, et al.

William D. Wilmoth, Esq., Steptoe & Johnson, PLLC, Wheeling, West Virginia, Attorney for Morgan Stanley.

William J. Cooper, Esq., Flaherty, Sensabaugh & Bonasso, Charleston, West Virginia, Attorney for J.P. Morgan & U.S. Bankcorp.

Edward D. McDevitt, Esq., Bowles Rice McDavid Graff & Love, Charleston, West Virginia, Attorney for UBS Warburg.

MAYNARD, Justice:

In this case, we answer a certified question from the Circuit Court of Marshall County which we reformulate [1] as follows:

> Does the Attorney General of West Virginia have the authority pursuant to W.Va. Code § 46A–6–104 (1974) of the Consumer Credit and Protection Act to bring an action based upon conduct that is ancillary to the general business of buying and selling securities?

For the reasons set forth below, we answer the certified question in the negative.

## I.

## FACTS

The Attorney General brought a civil action in the Circuit Court of Marshall County against several financial service companies (hereinafter "the defendants") in which he sought civil penalties against the defendants for alleged violations of W.Va.Code § 46A–6–104 (1974) of the Consumer Credit and Protection Act (hereinafter "the consumer protection act"). This code section declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

Specifically, the complaint alleges that each of the defendants had at least two components to its business—an investment banking component and a stock and securities research analyst component. The investment banking component served as an intermediary between the companies issuing stock and the investing public and provided various services to the issuing company such as underwriting, guaranteeing prices, and otherwise assisting in the promotion and sale of the issuing companies' stocks. The defendants' investment banking practices also generated fees for making markets in new securities. On the other hand, the defendants' stock research analyst components disseminated to the public reports, opinions, and ratings regarding individual securities.

The Attorney General avers in his complaint that the defendants' investment banking components manipulated their supposedly independent research analysts into issuing false forecasts to promote debt and equity securities issued by companies with which the defendants' had undisclosed investment banking relationships in order to reap huge profits at the expense of an uninformed public.

The defendants filed motions to dismiss on the basis, *inter alia*, that the West Virginia Consumer Credit and Protection Act does not apply to a business organization that buys and sells securities. The circuit court denied the defendants' motions to dismiss but granted their motions to certify a question of law to this Court.[2] We now proceed to address the certified question as reformulated.[3]

---

**1.** *See* Syllabus Point 3 of *Kincaid v. Mangum,* 189 W.Va. 404, 432 S.E.2d 74 (1993) (recognizing this Court's power to reformulate certified questions).

**2.** The question as certified by the circuit court asked,

> Does the fact that a business entity has the buying and selling of securities as a component of its business exempt it from being prosecuted by the State of West Virginia through its Attorney General, under W.Va.Code § 46A–7–101 *et seq.,* where the State is seeking to impose civil penalties on the business entity for allegedly committing unfair and deceptive acts in the conduct of commerce in violation of W.Va.

Code § 46A–6–101 *et seq.,* (General Consumer Protection)?

The circuit court answered its certified question in the negative.

**3.** This Court finds that the issue before us is proper for certification. The defendants challenge the sufficiency of the Attorney General's pleading, and W.Va.Code § 58–5–2 (1998) specifically authorizes certification of any question of law arising "upon a challenge of the sufficiency of a pleading." Also, we find that there is a sufficiently precise and undisputed factual record on which the legal issue can be determined, and that this legal issue substantially controls the case. *Bass v. Coltelli,* 192 W.Va. 516, 453 S.E.2d 350 (1994).

## II.

### STANDARD OF REVIEW

■ As we have often reiterated, "[t]he appellate standard of review of questions of law answered and certified by a circuit court is *de novo.*" Syllabus Point 1, *Gallapoo v. Wal–Mart Stores, Inc.*, 197 W.Va. 172, 475 S.E.2d 172 (1996).

## III.

### DISCUSSION

We begin our discussion with the recognition that "[t]he powers and duties of the Attorney General are specified by the constitution and by rules of law prescribed pursuant thereto." Syllabus Point 1, *Manchin v. Browning*, 170 W.Va. 779, 296 S.E.2d 909 (1982). The Legislature has granted to the Attorney General the authority to bring civil actions to enforce the consumer protection act. *See* W.Va.Code § 46A–7–108 (1974) (stating that "[t]he attorney general may bring a civil action to restrain a person from violating this chapter and for other appropriate relief"). As noted above, the Attorney General brought the action at issue in this case pursuant to W.Va.Code § 46A–6–104 (1974) which prohibits, in relevant part, "unfair or deceptive acts or practices in the conduct of any trade or commerce."

According to W.Va.Code § 46A–6–102(e) (1996),[4] " '[t]rade' or 'commerce' means the *advertising, offering for sale, sale or distribution of any goods or services and shall include any trade or commerce, directly or indirectly, affecting the people of this state.*" Article 6 of Chapter 46A does not contain its own definition of "goods" or "services." However, *the definition of "goods" found in the general definition section of the consumer protection act defines "goods" to include "goods not in existence at the time the transaction is entered into and gift and merchandise certificates, but excludes money, chattel paper, documents of title and instruments."* W.Va.Code § 46A–1–102(21) (1996). "Services," also defined in the consumer protection act's general definition section, is defined

as: "(a) Work, labor and other personal services; (b) privileges with respect to transportation, use of vehicles, hotel and restaurant accommodations, education, entertainment, recreation, physical culture, hospital accommodations, funerals, cemetery accommodations, and the like; and (c) insurance." W.Va.Code § 46A–1–102(47) (1996).

The Attorney General concedes that, because the definition of "goods" in the consumer protection act expressly excludes "instruments," and because securities are instruments, the Act does not apply to the actual buying and selling of securities. The Attorney General posits, however, that nothing in the definition of "goods" and "services" excludes the Act's application to the sale and distribution of research reports. Specifically, the Attorney General opines that research reports fall under the Act's definition of "goods" as well as the Act's broad definition of "services" which includes "work, labor and other personal services." Finally, notes the Attorney General, neither the "Exempted transactions" section at W.Va.Code § 46A–6–105 (1974), which applies specifically to the unlawful acts or practices provision under which the Attorney General filed his action, nor the general "Exclusions" section applicable to the entire chapter, W.Va.Code § 46A–1–105 (2000), mentions the securities industry, the financial services industry, the investment banking industry, or the type of conduct at issue in this case. In sum, it is essentially the Attorney General's position that, although the consumer protection act does not apply to the buying and selling of securities, it does apply to fraudulent and deceptive practices in the providing of investment advice.

■ In deciding the question before us, we are guided herein by our previous recognition that *W.Va.Code § 46A–6–104 is among the most ambiguous provisions of the consumer protection act. See McFoy v. Amerigas, Inc.*, 170 W.Va. 526, 529, 295 S.E.2d 16, 19 (1982) (stating that *"Code, 46A–6–104 [1974] is among the most broadly drawn provisions contained in the Consumer Credit*

---

**4.** This code section was recently amended and the definition of "trade or commerce" quoted

above now appears at W.Va.Code § 46–6–102(6) (2005).

and Protection Act and it is also among the most ambiguous"). "Judicial interpretation of a statute is warranted only if the statute is ambiguous and the initial step in such interpretive inquiry is to ascertain the legislative intent." Syllabus Point 1, *Ohio County Com'n v. Manchin*, 171 W.Va. 552, 301 S.E.2d 183 (1983). In determining legislative intent, we endeavor to construe the statute at issue consistently with the purpose of the general body of law of which it forms a part. This is because "[s]tatutes which relate to the same subject matter should be read and applied together so that the Legislature's intention can be gathered from the whole of the enactments." Syllabus Point 3, *Smith v. State Workmen's Compensation Com'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975). Accordingly, it is instructive for us to discern the purpose of the general law, the consumer protection act, of which the statute at issue forms a part.[5]

■ After careful consideration of the issue, for the reasons set forth below, this Court declines to adopt the distinction urged on us by the Attorney General. Clearly, the service of providing investment advice and analyses is so ancillary or subsidiary to the buying and selling of securities, it is only reasonable to conclude that such conduct does not fall within the scope of the consumer-type transactions governed by the consumer protection act. We believe that this conclusion is amply supported by the history, origins, and general understanding of the purposes of the consumer protection act as well as the manner in which the buying and selling of securities is regulated which we discuss below.[6]

As noted above, the statute before us, W.Va.Code § 46A–6–104, forms a part of the Consumer Credit and Protection Act, W.Va. Code §§ 46A–1–101, *et seq.* In his law review article, *The West Virginia Consumer Credit and Protection Act*, 77 W.Va.L.Rev. 401 (1974–75), Professor Vincent Cardi, a law professor at the West Virginia University College of Law and the foremost expert in this area of the law, explains that our consumer protection act arose from the consumer protection movement that gained force throughout the United States in the 1960s. He further notes that the sources that make up West Virginia's consumer protection act were the common law decisions designed to protect consumers, federal consumer protection acts, and two model acts from which it borrows heavily—the Uniform Consumer Credit Code (hereafter "UCCC") and the National Consumer Act (hereafter "NCA"). According to Professor Cardi, the UCCC began as an effort to draft a model retail installment sales act but was expanded to cover all types of extensions of consumer credit and all types of credit abuses in consumer transactions. The NCA, on the other hand, originated from the belief that the UCCC did not concern itself enough with the problems of the poor, and includes more provisions intended to protect consumers and to abolish, rather than merely regulate, abusive credit practices. 77 W.Va.L.Rev. at 408–409. Notably, the Legislature enacted the consumer protection act a mere four days before it enacted the Uniform Securities Act (hereafter "securities act"), the sole purpose of which is the regulation of securities.[7]

**5.** According to W.Va.Code § 46A–6–101(1) (1974), courts should be guided by applicable federal statutes such as the Federal Trade Commission Act in construing article 6. However, we agree with the Attorney General that cases construing the Federal Trade Commission Act do not aid in resolving the question before us because those cases generally do not provide meaningful analysis on this specific issue.

**6.** This Court has reviewed the cases cited to us by the Attorney General for the proposition that although the sale of a security is not a "good," misleading investment advice, including distorted market research and inflated forecasts, remain actionable as "services" under that state's respective consumer protection act. We do not

find the reasoning in these cases to be persuasive.

**7.** Significantly, the securities act appears to cover substantially the same conduct on which the Attorney General based his complaint against Defendants. For example, W.Va.Code § 32–1–101 (1974), provides that,

It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly
    (1) To employ any device, scheme or artifice to defraud;
    (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements

Concerning the purpose of the consumer protection act, Professor Cardi writes that,

The West Virginia Consumer Credit and Protection Act is intended to: (1) increase the availability of consumer credit by raising allowable finance charges (interest rates) and move toward equalization of rates available to consumers whether they borrow the money from a lender or buy the goods on credit from a seller; (2) regulate the rate of finance charges allowed for consumer credit transactions by prescribing rates and rules for computation; (3) regulate those businesses which make small consumer loans and which were formerly regulated by the small loan act; (4) protect consumers who purchase goods or services on credit or through consumer loans from deceptive selling techniques, unconscionable contract terms, and undesirable debt recovery and collection practices; and (5) protect consumers who purchase goods or services for cash or credit from, and to give them remedies for, defective or shoddy goods and services and unfair and deceptive selling practices.

77 W.Va.L.Rev. at 402. This Court has similarly described the consumer protection act as "a comprehensive attempt on the part of the Legislature to extend protection to the consumers and persons who obtain credit in this State and who obviously constitute the vast majority of our adult citizens." *Harless v. First National Bank,* 162 W.Va. 116, 125, 246 S.E.2d 270, 275—76 (1978) (footnote omitted).

We believe that the origin, history, and purposes of the consumer protection act, briefly discussed above, indicate that it is not intended to apply to conduct that is ancillary to the buying and selling of securities. The consumer protection act is essentially designed to protect consumers in the relatively common cash and credit transactions in which they engage on a regular basis.[8] These types of transactions contrast sharply with the highly specialized and complex conduct involved in providing securities research and analysis as a component of investment banking. Also, the fact that the consumer protection act was enacted at approximately the same time as the securities act indicates that the two acts were intended to fulfill two completely different purposes—the regulation of common consumer transactions and the regulation of the buying and selling of securities and conduct ancillary thereto.

---

made, in the light of the circumstances under which they are made, not misleading; or

(3) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

According to W.Va.Code § 32–2–204(b) (2002),

With regard to brokers-dealers and agents, dishonest or unethical practices in the securities business includes, but is not limited to:

\* \* \* \* \* \*

(3) Recommending to a customer the purchase, sale or exchange of any security without reasonable grounds to believe that the transaction or recommendation is suitable for the customer based upon reasonable inquiry concerning the customer's investment objectives, financial situation and needs and any other relevant information known by the broker-dealer and/or agent;

\* \* \* \* \* \*

(19) Effecting any transaction in, or inducing the purchase or sale of, any security by means of any manipulative, deceptive or fraudulent device, practice, plan, program, design or contrivance...;

\* \* \* \* \* \*

(22) Using any advertising or sales presentation which is deceptive or misleading, such as the distribution of any nonfactual data, material or presentation based on conjecture, unfounded or unrealistic claims or assertions in any brochure, flyer or display by works, pictures, graphs or otherwise designed to supplement, detract from, supercede or defeat the purpose or effect of any prospectus or disclosure;

\* \* \* \* \* \*

(33) Engaging in any other act or practice which the [securities] commissioner determines to constitute dishonest or unethical practices in the securities business....

While this Court acknowledges the differences in remedies and enforcement mechanisms between the consumer protection act and the securities act, we do not believe that these differences diminish the implication that because the acts were enacted only a few days apart, the Legislature intended that they would have different purposes.

8. We note that pursuant to W.Va.Code § 46A–6F–104(2) (1998), for the purposes only of article 6F dealing with telemarketing, "[c]onsumer goods or services" means "[a]ny property or service offered or sold for the purpose of providing a profit or investment opportunity[.]"

In addition, the fact that the securities industry is so pervasively regulated by the federal government makes it doubtful to this Court that the Legislature intended to give securities investors an added measure of protection above that already provided by the various federal acts and the State securities act, and even more doubtful that the Legislature intended to do so in an ambiguous provision of the consumer protection act. Accordingly, for the reasons discussed above, we hold that the Attorney General of West Virginia does not have the authority pursuant to W.Va.Code § 46A–6–104 (1974) of the Consumer Credit and Protection Act to bring an action based upon conduct that is ancillary[9] to the general business of buying and selling securities.

Finally, prior to concluding this matter, this Court deems it necessary to emphasize that this opinion should not be read as an attempt to in any way diminish the power of the office of the Attorney General. This Court recognizes and respects the powers granted the Attorney General by the Constitution and by statute, including the authority to enforce the provisions of the consumer protection act. Rather, it must be understood that the legal issue before us is a narrow one and that our resolution of this issue rests, as explained above, solely on this Court's understanding of the Legislature's intent in drafting W.Va.Code § 46A–6–104.

## IV.

## CONCLUSION

For the reasons set forth above, we answer the reformulated certified question as follows:

Does the Attorney General of West Virginia have the authority pursuant to W.Va. Code § 46A–6–104 (1974) of the Consumer Credit and Protection Act to bring an action based upon conduct that is ancillary to the general business of buying and selling securities?

Answer: No.

Certified question answered.

STARCHER, J., concurring, in part, and dissenting, in part:

(Filed July 12, 2005)

I concur with the majority opinion to the extent that the Attorney General's authority is apparently limited in the underlying case by the fact that the defendants below had already reached a global settlement of securities law violation charges—with the West Virginia auditor as a party to the settlement. Under various equitable principles—estoppel, etc.—this settlement probably inures to some degree to the defendant's benefit.

I also concur with the majority in recognizing the primary authority of the Auditor to regulate the legitimate business of the sale of securities in our State.

I part company with the majority opinion to the extent that it might be erroneously construed to shield obvious consumer scams that "masquerade" as selling securities from the Attorney General's scrutiny.

An example: an ad in the paper selling purported shares in a non-existent gold mine. This is not misconduct by a *bona fide* securities dealer. It's a clear consumer scam, and, of course, the Legislature intended the Attorney General's Consumer Protection Division to prosecute such scams.

Accordingly, I concur, in part, and dissent, in part.

Justice STARCHER concurs, in part, dissents, in part, and reserves the right to file a separate opinion.

9. By the use of the term "ancillary," we mean that the selling or promulgating of investment reports is a subsidiary business to the general business of buying and selling securities. In other words, but for the business of buying and selling securities, there would be no business of selling investment reports. We do *not* mean that the misleading investment reports alleged in the Attorney General's complaint were sold incident to specific sales of securities by the defendants herein.