470 S.E.2d 205

**STATE of West Virginia ex rel. AMY M., Shane B., II, Jesse B., Matthew B., and Travis B., Petitioner,**

v.

**Honorable Tod J. KAUFMAN, Judge of the Circuit Court of Kanawha County, Betty Jo B., and Shane B., Respondents.**

No. 23212.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 6, 1996.

Decided April 8, 1996.

Brenda Waugh, Assistant Prosecuting Attorney, Charleston, for State.

Mary H. Sanders, Kathleen H. Jones, Huddleston, Bolen, Beatty, Porter & Copen, Charleston, for Amy M., Shane B. II, Jesse B., and Travis B.

Herbert L. Hively, II, Johnson Law Offices, Dina H. Mohler, Kay, Casto, Chaney, Love & Wise, Charleston, for Betty Jo B.

Robin Godfrey, Charleston, for Shane B.

WORKMAN, Justice.

■ This case is before the Court on a petition for a writ of prohibition and mandamus against the Honorable Tod J. Kaufman, Judge of the Circuit Court of Kanawha County, by the Petitioners, Amy M., Shane B., II, Jesse B., Matthew B., and Travis B.,[1] all children who are the subjects of the underlying abuse and neglect proceedings, and the State of West Virginia. Betty Jo B. and Shane B., parents of the petitioning minors, are also named as Respondents. Both the State and the children's guardian ad litem[2] seek relief from a November 20, 1995 order, in which the Respondent judge ordered a post-adjudicatory improvement period for the Respondent mother, Betty Jo B. Petitioners contend that an additional improvement period is not in the best interests of the children. They ask this Court to prohibit the circuit court from enforcing the order granting a post-adjudicatory improvement period, and to order the circuit court to set this matter immediately for final disposition pursuant to West Virginia Code § 49–6–5 (1995). We agree with the petitioners' contentions, and award the writ requested.

## I.

## FACTS

Betty Jo B. is a twenty-three-year-old mother of five, now pregnant with her sixth child. The children range in age from two to seven. Shane B. is the father of four of the children, and is alleged to be the father of the fifth as well. The parents are separated, and have not lived together since shortly after the birth of the youngest children, who are twins. Shane B. has had no contact with any of the children since June, 1994.

From the standpoint of legal intervention, this case began on February 1, 1994, when the police responded to a call from a family friend, who stated that he was caring for two of the children and refused to do so any longer. The friend related that Mrs. B. had asked him to watch the children while she went out to cash a check. When she had not returned by the following day, he called the police. The police found the children living in conditions they described as "beyond belief," including human excrement in the toilet, all over a potty chair and smeared on the walls; broken glass, trash, food, and dirty diapers strewn throughout the house; a filthy bathroom; urine-stained beds with no sheets; and a large kitchen knife on the bedroom floor. The children, then aged eight months to five years, had no food, and what little clothing they had was extremely dirty. All were badly infested with head lice, and ill to varying degrees. The police took emergency custody of the children immediately.

Prior to this incident, the West Virginia Department of Health and Human Resources ("DHHR") had documented several incidents of police, medical, and social service intervention dating back to April 15, 1991. Relatives and neighbors had taken the children to local hospitals more than once, posing as Betty Jo B. Apparently the mother was afraid to seek medical attention for them, fearing reprisals from the welfare authorities. At one time the older children were sleeping on a box on the floor, while

---

**1.** We follow our past practice in domestic and juvenile cases that involve sensitive facts, and do not use the last names of the parties. *See State ex rel. West Virginia Dep't of Human Servs. v. Cheryl M.*, 177 W.Va. 688, 689, 356 S.E.2d 181, 182 n. 1 (1987).

**2.** We have previously indicated that a guardian ad litem "must exercise reasonable diligence in carrying out the responsibility of protecting the rights of the children[,]" including "exercising

the appellate rights of the children, if, in the reasonable judgment of the guardian *ad litem*, an appeal is necessary." Syl. Pt. 3, in part, *In re Scottie D.*, 185 W.Va. 191, 406 S.E.2d 214 (1991) (emphasis in original). Guardians ad litem, however, frequently fail to carry out this responsibility. The guardian ad litem in the instant case is to be commended for being aggressive in her representation of these children.

the infant twins, who had no cribs, slept in a car seat and a baby swing. There were also reports of numerous abandonments for days at a time without adequate provision for food, diapers, or supervision of the children. A child protective services worker who was sent to the home in July, 1993, testified to deplorable living conditions at that time, including no beds, no food, ill children, and generally unsanitary conditions. A nurse who examined Amy M. in November, 1993, testified that the child had a urinary tract infection so severe that it had the potential for serious long-term consequences. To make matters worse, she was wearing dirty clothing and "filthy little underpanties," and was accompanied to the emergency room by a mother who was so obviously intoxicated that the nurse felt it necessary to call a neighbor and a cab just to get the child home safely.

The Circuit Court of Kanawha County granted an initial prè-adjudicatory improvement period, then extended it on three subsequent occasions, so that eventually improvement periods spanned almost two years, from February 10, 1994, through November 1, 1995. We review the conditions and results of those improvement periods in some detail here, as these facts are relevant to our decision.

The circuit court issued its first order on February 10, 1994, ten days after the children were removed from the home and six days after a petition alleging abuse and neglect was filed. Both parents were represented by counsel, and both waived their right to a preliminary hearing. The Circuit Court granted temporary custody to DHHR, directed DHHR to prepare a family case plan to identify existing problems and propose a course of action within thirty days, and ordered a psychological evaluation of the mother, substance abuse evaluations of both parents, parenting classes for the mother, and medical and psychological evaluations of each of the children. The court granted the parents' motion for an improvement period,

to begin February 10, 1994, and end May 10, 1994. During this time, the parents were directed to comply with the investigations and evaluations outlined in the order, and were granted supervised visitation with the children for one hour each week.

The court held a status review on May 27, 1994, soon after the end of the first improvement period. The court observed that both parents had visited the children consistent with the original order, that the mother had obtained a psychological evaluation and had been participating in parenting classes, and that the father had obtained a substance abuse evaluation. Based on this progress, the court expanded both parents' visitation with the children to include in-home unsupervised overnight visitation when DHHR found it to be in the best interests of the children. The circuit court then extended the improvement period for an additional six months, to expire on November 30, 1994, with a status review on June 29, 1994.

The record does not include any documentation from the conference scheduled for June 29, but the next order entered, on November 2, 1994, near the end of the second improvement period, indicates deterioration in the parents' progress toward reunification with their children. Betty Jo B. continued to visit the children, but her participation in parenting class had tapered off. Shane B. had not attended parenting classes at all, and had not visited the children since June. During one unsupervised visit around this time, Betty Jo B. left six-year-old Amy and the one-year-old twins at her mother's house while she took Jesse, age two, and Shane, age four, to a bar. Amy went out on her own, searching for her mother in the bars. The children also reported seeing a boyfriend strike their mother, and the twins returned from one visit with unexplained knots on their heads. The court in the November order tightened up the restrictions on visitation considerably, and set out definite goals to be accomplished prior to the expiration of the improvement period.[3] It

---

**3.** The November 2, 1994, order provided:

Visitation with the respondent mother may be supervised by the persons providing in-home parenting class, if necessary for the supervision

of the children. Further the visitations shall take place at the Department if the persons providing in-home parenting determine that the home is unfit for visitation. However, the

again extended the improvement period, but scheduled an adjudicatory hearing on January 13, 1995. Until this point, the circuit court appears to have adequately monitored the case, and timely reviewed ongoing progress.[4]

There was no adjudicatory hearing on January 13, 1995, but the next order entered, dated March 25, 1995, recites that the improvement period was extended. In the March order, Judge Kaufman found that Betty Jo B. had complied with the terms set out in the November order, and directed her to enroll in a counseling program at DHHR's expense. He also directed continuation of in-home services through Children's Home Society. The judge increased Ms. B's visitation to two hour-long visits per week, with additional overnight visits at least twice each month. In connection with the overnight visits, the court ordered DHHR to provide suitable bedding for the children, and to assist the mother in arranging for structured activities.

Unfortunately, the court's optimism turned out to be unmerited. The following month, after an overnight visit on April 13–14, 1995, the assistant prosecuting attorney for Kanawha County filed a motion to terminate overnight visitation and to set the matter down for adjudication. The motion alleged that although Ms. B. had indicated that she had a playpen for the younger children to sleep in,

she did not, and that the children slept on the bare floor despite the efforts of DHHS to have them sleep on blankets. In addition, Jesse had an asthma attack triggered by exposure to cigarette smoke, and the mother was not even present for the whole visit.

It was not until August 29, 1995, four months after the alleged incident, that an adjudicatory hearing was held.[5] The record before us suggests that this was the first and only evidentiary hearing in a matter that has now gone on for over two years.[6] At this hearing, Judge Kaufman heard the testimony of Betty Jo B. and witnesses for the State. Based on the evidence adduced at the adjudicatory hearing, the court appears to have concluded that the mother's inability to obtain suitable housing was at the heart of the problem. He ordered DHHR to pay $906 to the public housing authority to cover the cost of damages[7] to housing she had occupied before becoming homeless. Rather than terminate the improvement period (which had been in effect since February 10, 1994, and was now apparently open-ended), the court directed the State to continue to allow weekly visits by the mother (and the father "if he wishes") and to arrange additional weekend visits with the mother. The order does not specify whether these visits should be supervised. The court took the issue of abuse and neglect under advisement, pending an addi-

---

visits may be conducted in the home if Ms. B[][.] renders the home safe for the children in the home. During the visitation, Ms. B[][.] shall demonstrate the following:

1. She shall show adequate supervision of all children;

2. She shall have food available for the children;

3. Jeff Blizzard [Ms. B.'s boyfriend] shall not be present at the time of the visitation;

4. The mother shall insure that the home is safe for the children; and

5. The mother shall not consume or permit any other person to consume alcohol in the presence of the children.

4. "Subsequent to the initial formulation of the improvement plan and family case plans, it is imperative that the progress of the parent(s) toward the achievement of enumerated goals be monitored closely." *In re Carlita B.*, 185 W.Va. 613, 625, 408 S.E.2d 365, 377 (1991). The circuit court initially adhered to this requirement, but eventually lapsed into a pattern of continuing

to extend the improvement period even when evidence of any real improvement was clearly diminishing.

5. The term "adjudicatory hearing" refers to the hearing at which the court determines whether a child is "abused or neglected." *See* W. Va. Code § 49–6–2(c) (1995).

6. The parents in this case waived their right to a preliminary hearing. Ordinarily, the preliminary hearing would be the first opportunity for both sides to present evidence in a custody case. *See* W.Va. Code §§ 49–6–3(a); 49–6–1 (1995). This case illustrates one of the difficulties created by the continuation of pre-adjudicatory improvement periods beyond the period the statute permits.

7. There was difficulty in obtaining housing for the mother because the public housing authority refused to have her as a tenant due to extensive damages to the apartment she had previously rented from them.

tional hearing set for September 26, 1995, for arguments of counsel based on the evidence adduced. No hearing took place, however, until November 1, 1995.

Finally, on November 20, 1995, fully one year and nine months after the children were removed from the home, and having exhausted nearly every possibility of parent education and rehabilitation with little or no improvement apparent upon the record, the court made a finding of neglect under West Virginia Code § 49–6–2(c) (1995). On the same day, over the vehement objection of both the State and the guardian ad litem, the judge granted a post-adjudicatory improvement period of unspecified duration and with no direction regarding terms or conditions.[8] Counsel for the State and the guardian ad litem represented to this Court during oral argument that motions were made to reconsider the ruling and to proceed to final disposition, along with requests to present further evidence, including the testimony of a therapist who has been working with the three oldest children. According to counsel, during oral argument before this Court, these motions were denied.[9]

## II.

### CRITERIA FOR AWARDING A WRIT OF PROHIBITION

 Prohibition is an appropriate remedy in cases in which the lower court has no jurisdiction over the subject matter in controversy, or, having such jurisdiction, exceeds its legitimate powers. W.Va. Code § 53–1–1 (1994). Here, the trial court has jurisdiction, so we look to syllabus point one of *Hinkle v. Black,* 164 W.Va. 112, 262 S.E.2d 744 (1979):

> In determining whether to grant a rule to show cause in prohibition when a court

is not acting in excess of its jurisdiction, this Court will look to the adequacy of other available remedies such as appeal and to the over-all economy of effort and money among litigants, lawyers and courts; however, this Court will use prohibition in this discretionary way to correct only substantial, clear-cut, legal errors plainly in contravention of a clear statutory, constitutional, or common law mandate which may be resolved independently of any disputed facts and only in cases where there is a high probability that the trial will be completely reversed if the error is not corrected in advance.

*Id.* at 112, 262 S.E.2d at 745. Thus "prohibition may be substituted for a writ of error or appeal when the latter alternatives would provide an inadequate remedy." *State ex rel. Chafin v. Halbritter,* 191 W.Va. 741, 743–44, 448 S.E.2d 428, 430–31 (1994) (citations omitted). Further, this Court has recognized that "[o]ur modern practice is to allow the use of prohibition, based on the particular facts of the case, where a remedy by appeal is unavailable or inadequate, or where irremediable prejudice may result from lack of an adequate interlocutory review." *McFoy v. Amerigas, Inc.,* 170 W.Va. 526, 532, 295 S.E.2d 16, 22 (1982); *accord, Chafin,* 191 W.Va. at 744, 448 S.E.2d at 431.

 As we said in *In re Carlita B.,* 185 W.Va. 613, 623, 408 S.E.2d 365, 375 (1991), the early, most formative years of a child's life are crucial to his or her development. There would be no adequate remedy at law for these children were they permitted to continue in this abyss of uncertainty. We have repeatedly emphasized that children have a right to resolution of their life situations, to a basic level of nurturance, protection, and security, and to a permanent place-

---

**8.** On December 22, 1995, the day after a petition for a writ of prohibition was filed in this Court, the court issued a second order granting a 90–day improvement period to begin on the date of the November hearing, and directing that visitation shall be supervised. The court also directed DHHR to continue in its efforts to obtain suitable housing for Betty Jo B.

**9.** In addition, counsel offered affidavits indicating that Amy M. returned from a Thanksgiving visit with her mother upset and crying, because

Betty Jo B. had told Amy she didn't want her anymore; that the mother openly insults the children's foster parents, calls them names, and has threatened to blow up their house; that Amy, age 7, has become so insecure she is asking for a baby bottle; and that Jessie's behavior has become extremely aggressive. Counsel represented during oral argument that the circuit court refused to allow them to introduce this and other evidence.

ment. The legislature has recognized this by limiting the extent and duration of improvement periods a court may grant in an abuse and neglect case. *See* W.Va. Code § 49–6–2(b). Because the lower court violated this clear statutory mandate, and irremediable prejudice may result from the delays inherent in waiting to appeal a final disposition, we find that prohibition is an appropriate remedy in this case. Thus, prohibition is available to abused and/or neglected children to restrain courts from granting improvement periods of a greater extent and duration than permitted under West Virginia Code §§ 49–6–2(b) and 49–6–5(c) (1995).

## III.

### IMPROVEMENT PERIOD

■ At issue in this case is whether improvement periods in abuse and neglect cases, through extensions and procedural delays, in the face of little evidence indicating real progress, can eventually become so protracted that they violate "clear statutory, constitutional, or common law mandate." *Hinkle,* 164 W.Va. at 112, 262 S.E.2d at 745, Syl. Pt. 1. West Virginia Code § 49–6–2(b) (1995), in effect during this case, authorizes any parent or custodian to request *"an improvement period of three to twelve months* in order to remedy the circumstances or alleged circumstances upon which the proceeding is based." (emphasis added). Further, the statute during the time period relevant to these proceedings directed the court to "allow *one* such improvement period unless it finds compelling circumstances to justify a denial thereof...." (emphasis added). This provision sets out a clear statutory mandate that a pre-adjudicatory improvement period not exceed a maximum of twelve months.[10]

Furthermore, we find it important to note that House Bill 4138, passed by the West Virginia Legislature on March 9, 1996, and effective June 8, 1996, revises our law regarding improvement periods by amending

West Virginia Code §§ 49–6–2(b) and 49–6–5(c), and adding new § 49–6–12. The Legislature's enactment of these provisions establishes a clear statutory mandate to limit pre-adjudicatory improvement periods to three months, and post-adjudicatory improvement periods to six months, with a three-month extension of a post-adjudicatory improvement period possible under certain defined circumstances.

■ The goal of an improvement period is to facilitate the reunification of families whenever that reunification is in the best interests of the children involved. Both the statute and our case law grant trial courts considerable flexibility in developing meaningful improvement periods designed to address the myriad possible problems causing abuse and neglect. We have held repeatedly, however, that "courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened...." Syl. Pt. 1, in part, *In re R.J.M.,* 164 W.Va. 496, 266 S.E.2d 114 (1980); *accord, In re Carlita B.,* 185 W.Va. 613, 629, 408 S.E.2d 365, 381 (1991).

As we explained in *West Virginia Dept. of Human Serv. v. Peggy F.,* 184 W.Va. 60, 64, 399 S.E.2d 460, 464 (1990), it is possible for an individual to show "compliance with specific aspects of the case plan" while failing "to improve ... [the] overall attitude and approach to parenting." Thus, a judgment regarding the success of an improvement period is within the court's discretion regardless of whether or not the individual has completed all suggestions or goals set forth in family case plans.

The improvement period is granted to allow the parent an opportunity to remedy the existing problems. The case plan simply provides an approach to solving them. As is clear from the language of the statute, ... the ultimate goal is restoration of

---

**10.** In addition, West Virginia Code § 49–6–5(c) (1995) provides that the court may, after a finding of abuse or neglect, allow the parents or custodians a post-adjudicatory improvement period *not to exceed twelve months* as an alternative to terminating parental rights. The latter statute specifically states that "[n]o more than one such post-dispositional improvement period may be granted."

a stable family environment, not simply meeting the requirements of the case plan.

*Carlita B.*, 185 W.Va. at 626, 408 S.E.2d at 378 (quoting, in part, *Peggy F.*, 184 W.Va. at 64, 399 S.E.2d at 464).

■ When one year had passed from the time the children in this case were removed from the home, this matter was ripe for adjudication.[11] At that time, although Betty Jo B. had attended her visitations and sporadically attended court-ordered parenting classes, she had made little progress toward being able to provide the children with a safe and healthy living environment. At some point during the improvement period she became homeless. Toward the end of that first year, unsupervised visitation was not going smoothly, and the circuit court still felt the need to place detailed restrictions on visitation, as evidenced by the November 2, 1994, order. When the court set an adjudicatory hearing for January 13, 1995, it acted appropriately.

■ The problem, as pointed out in *Carlita B.*, is the tendency of cases such as these to fall through the cracks, as this one did. 185 W.Va. at 623, 408 S.E.2d at 375. As noted above, no evidentiary hearing was held in this case until eight months after it was originally scheduled, and the determination of neglect came two months later, on November 20, 1995. Such delays are in clear contravention of the directive in West Virginia Code § 49–6–2(d) and case law that matters involving the abuse and neglect of children take precedence over almost every other matter with which a court deals on a daily basis, and such proceedings must be resolved as expeditiously as possible. *See In re Carlita B.*, 185 W.Va. at 625, 408 S.E.2d at 377.

■ To further postpone any permanency decision with regard to these children would be unconscionable. The legislature provided for a pre-adjudicatory improvement period of three to twelve months, and, if appropriate, a post-adjudicatory improvement period of up to twelve months. W.Va.

Code §§ 49–6–2(b) & 49–6–5(c). Thus, the pre-adjudicatory improvement period should not have been extended beyond a total of twelve months under any circumstances.

Instead, in this case, five young children have lived in foster care limbo since February 1, 1994, more than two years of their young lives. The relationship between the foster parents and the Respondent mother has grown hostile. The children's behavior has deteriorated in recent months as they feel the uncertainty surrounding their situation. The circuit court's almost total focus on housing in the latter part of the improvement period appears to have ignored more significant parenting problems. Betty Jo B. had housing when this proceeding was initiated, and it did not appear to have aided her parenting skills. The greater concern should have been the mother's ambivalent feelings toward at least one of the children, her pattern of absenting herself from them during visitations, and her lack of cooperation with the plan designed to reunify her with her children. The father's lack of interest seems even more compelling. Upon remand, these and other issues relating to parenting ability should be examined closely.

■ Because the circuit court's grant of an extended pre-adjudicatory improvement period violated the clear statutory mandate of West Virginia Code § 49–6–2(b), because its handling of this case violated the clear mandate of this Court in *Carlita B.* that matters involving the abuse and neglect of children shall take precedence over almost every other matter and must be resolved as expeditiously as possible, *see* 185 W.Va. at 626, 408 S.E.2d at 378, and because the record demonstrates the children's emotional well-being is rapidly deteriorating, we grant the writ of prohibition to prevent the circuit court of Kanawha County from enforcing its order of an additional post-adjudicatory improvement period in this case. Although West Virginia Code § 49–6–5(c) allows a court to grant a post-adjudicatory improve-

---

**11.** Twelve months was the statutory maximum for improvement periods. It is quite possible

that this case was ready for adjudication sooner,

ment period of up to twelve months,[12] the Respondent mother in this case has, as a practical matter, already been granted a total improvement period in excess of the maximum combined pre- and post-adjudicatory improvement periods, and is therefore not entitled to any further improvement periods.

■■■ A circuit judge overseeing a case such as this has an immensely difficult task, for in many abuse and neglect cases there is a genuine emotional bond as well as the natural biological bond between parent and child which courts are understandably hesitant to break if there is hope of meaningful change. In most abuse and neglect cases, the parent(s) may have redeeming qualities that create such hope that they will be able to make the necessary changes to become adequate parents. As we said in *Carlita B.,*

> Certainly many delays [in abuse and neglect cases] are occasioned by the fact that troubled human relationships and aggravated parenting problems are not remedied overnight. The law properly recognizes that rights of natural parents enjoy a great deal of protection and that one of the primary goals of the social services network and the courts is to give aid to parents and children in an effort to reunite them.

The bulk of the most aggravated procedural delays, however, are occasioned less by the complexities of mending broken people and relationships than by the tendency of these types of cases to fall through the cracks in the system. The long procedural delays in this and most other abuse and neglect cases considered by this Court in the last decade indicate that neither the lawyers nor the courts are doing an adequate job of assuring that children—the most voiceless segment of our society—aren't left to languish in a

notably at the time of the November 2, 1994, hearing.

**12.** As noted earlier, a recent enactment will restrict post-adjudicatory improvement periods to six months, with a possible three-month extension.

limbo-like state during a time most crucial to their human development.

185 W.Va. at 623, 408 S.E.2d at 375.

Although it is sometimes a difficult task, the trial court must accept the fact that the statutory limits on improvement periods (as well as our case law limiting the right to improvement periods) dictate that there comes a time for decision, because a child deserves resolution and permanency in his or her life, and because part of that permanency must include at minimum a right to rely on his or her caretakers to be there to provide the basic nurturance of life.

Justice Cleckley's recent opinion in *In re Christina L.,* 194 W.Va. 446, 460 S.E.2d 692 (1995), helped forge the way for courts to recognize that, even where termination of parental rights is justified, a continued relationship between parent and child by means of post-termination visitation may be valuable to the child's emotional well-being. 194 W.Va. at 448, 460 S.E.2d at 694, syl. pt. 5. In the event the court below determines that the parental rights are to be terminated, it may still consider such a continued relationship if it is in the child's or children's best interests, and would not unreasonably interfere with their permanent placement.

## IV.

## ADDITIONAL EVIDENCE

■■■ A second issue is presented by the guardian ad litem's representation during oral argument before this Court that on November 20, 1995, the date the court issued its finding of neglect and ordered the post-adjudicatory improvement period, the respondent judge denied the guardian ad litem's motion to reconsider and her offer to adduce additional evidence.[13] As we said in *Christina L.:*

**13.** This evidence, which according to counsel was to include the testimony of a therapist who has been providing services for the three older children, would have given the court insight into the emotional status of the children. Any decision regarding their fate must necessarily take into account the effect upon these children of this protracted period of indecision, and of recent events both in and out of the courtroom.

There is a clear legislative directive that guardians ad litem and counsel for both sides be given an opportunity to advocate for their clients in child abuse or neglect proceedings. W.Va. Code, 49–6–5 (1992), states that the circuit court shall give "both the petitioner and respondents an opportunity to be heard" when proceeding to the disposition of the case.... This right must be understood to mean that the circuit court may not impose unreasonable limitations upon the function of guardians ad litem in representing their clients in accord with the traditions of the adversarial fact-finding process.

194 W.Va. at 453, 460 S.E.2d at 699. In *Christina L.,* we held that the trial court's refusal to allow the guardian ad litem to submit a proposed dispositional plan at the close of a dispositional hearing was reversible error. *Id.* at 454, 460 S.E.2d at 700.

 Specific guidelines for guardians ad litem in abuse and neglect cases were set out by Justice McHugh in *In re Jeffrey R.L.,* 190 W.Va. 24, 435 S.E.2d 162, (1993). Included in those guidelines are the following:

16. Subpoena witnesses for hearings or otherwise prepare testimony or cross-examination of witnesses and ensure that relevant material is introduced.

. . .

25. File a motion for modification of the dispositional order if a change of circumstances occurs for the child which warrants a modification or represent the child if said motion for modification is filed by any other party.

*Id.* at 41–42, 435 S.E.2d at 179–80. A trial court should not unreasonably deny a guardian the opportunity to fulfill these responsibilities. However, we do not reach this issue in the instant case, because it was not properly raised prior to oral argument, and because such evidence can be taken on remand.

Based on the foregoing, we hereby issue the writ of prohibition, prohibiting the Circuit Court of Kanawha County from enforcing its order of a post-adjudicatory improvement period in this case, and ordering it hear evidence and to proceed to final disposition as soon as possible pursuant to West Virginia

Code § 49–6–5. Should the court conclude that termination of parental rights is necessary, it should consider whether post-termination visitation is in the children's best interests.

Writ Granted as Moulded.