**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **L.C.**

**No. 21-0380** (Monongalia County 19-JA-113)

**MEMORANDUM DECISION**

Petitioner Father R.C., by counsel Amanda J. Ray, appeals the Circuit Court of Monongalia County's May 10, 2021, order terminating his parental rights to L.C.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Mindy M. Parsley, filed a response in support of the circuit court's order. The guardian ad litem, Teresa J. Lyons, filed a response on behalf of the child in support of the circuit court's order. Petitioner filed a reply. On appeal, petitioner argues that the circuit court erred in denying his motion for an improvement period and terminating his parental rights upon erroneous findings and conditions that were not alleged in the DHHR's petition.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

The proceedings in this matter were initiated upon a petition involving adult respondents other than petitioner. Relevant to this appeal, petitioner was first named as an abusing parent upon the DHHR's filing of an amended petition in March of 2020. According to the amended petition, the child's mother and stepfather were participating in a safety plan with the DHHR, during which law enforcement responded to L.C.'s elementary school upon reports that the child had marks on her face, neck, and back. Upon investigation, L.C. disclosed that her stepfather

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

1

caused the marks by throwing her around the home and grabbing her by the throat. When the DHHR responded to the child's home, it was found to be in an unacceptable condition. Both the mother and stepfather denied physical abuse and indicated that they were not actually living in the home but were, instead, sleeping at a neighbor's home. As to petitioner, the DHHR alleged that he was incarcerated at the time of the amended petition's filing for violating his probation related to his conviction of third-offense domestic battery. The DHHR alleged that petitioner abused and/or neglected L.C. by his failure to provide her with emotional and financial support and his inability to accept custody of the child due to his incarceration. Following the amended petition's filing, petitioner waived his right to a preliminary hearing. However, in announcing this waiver, petitioner made it clear that he "had nothing to do with the case" because he was "locked up when the kid got taken."

In October of 2020, petitioner expressed his desire to stipulate to certain allegations in the amended petition. The court rejected the proposed stipulation and proceeded to a contested adjudicatory hearing. The DHHR first introduced testimony from a Child Protective Services ("CPS") worker, who explained that petitioner was unable to accept custody of L.C. upon her removal from the home because of his incarceration for third-offense domestic battery. The witness also indicated that the child's mother confirmed that petitioner "had some contact" with the child, but that petitioner "spent more time in jail than he was out of jail." According to the CPS worker, L.C. "never really mentioned" petitioner and, instead, referred to her stepfather as "daddy." The witness was specifically asked the following: "So . . . when she was speaking about daddy, she did not refer to [petitioner] as her father; correct?" The witness responded, "Correct." The witness later clarified that L.C. "maybe, on one occasion she mentioned [petitioner] and, I think, she, basically, said he was in jail." The worker clarified that he thought L.C. called both her stepfather and petitioner "dad," but explained that he was "trying to remember because [he was] trying to go back months and months." He again indicated that the child knew petitioner was in jail, which was "just stuff she heard from her mom." The CPS worker also explained that the mother indicated that "it's been a while" since petitioner had contact with L.C. According to the mother, petitioner "did have visitation, but they hadn't been for a while because of him being in jail a lot lately." Ultimately, the witness was asked if he was requesting that petitioner be adjudicated because of his incarceration and lack of emotional support for the child, at which point he indicated that "I would think financial too. I know that [the mother] . . . spoke about that."

Petitioner then testified. He admitted that his visits with the child prior to his incarceration were limited, although he asserted that he spoke with the child over the phone from jail four or five times per week. During his testimony, petitioner again refused to accept that he was in any way responsible for the child's abuse and/or neglect, stating that "really, I'm the only really non-abusive parent right now in the case."

The child's stepfather also testified and explained that he had "raised [L.C.] from pretty much the time she was born." When asked why he was raising the child instead of petitioner, the stepfather responded that petitioner "did not want to be around." The stepfather also indicated that petitioner had initially called to speak with the child relatively frequently, but that it got to a point that "the calls ceased to exist" shortly before L.C.'s removal from the home.

Ultimately, the court adjudicated petitioner upon his "inability to support his child other than phone calls that have occurred on a limited basis over, maybe, several years, he has not been a person that could provide the necessary emotional and financial support for his child." The court also addressed the effect that the abuse had on the child's emotional wellbeing and her resulting behavioral issues. At that time, the court deferred ruling on visits with the child, instead leaving that issue up to the multidisciplinary team ("MDT") and the child's therapist. The court then indicated that petitioner could write letters to the child and provide them to the DHHR, at which point the DHHR would "run that past the professionals and decide if that's appropriate to give to" L.C.

The court then held a dispositional hearing in December of 2020. During the hearing, petitioner's counsel admitted that petitioner had "been incarcerated off and on for [L.C.'s] entire life" and that his substance abuse issues resulted in his most recent incarceration, as "he couldn't stay clean" and violated his probation. Counsel also admitted that petitioner "was not involved as a good parent should be" and that he "stipulated to being in jail and not being able to provide . . . support for his daughter because he was incarcerated." The circuit court refused to accept this stipulation. Counsel argued for an improvement period, speculating that "a year from now he might have a house and a job and be able to have custody of his daughter." The court, however, denied the motion, stating that petitioner had "just not been a part of [L.C.'s] life for her entire six years, . . . to any extent other than maybe . . . a phone call here and there."

Following this hearing, petitioner was released from incarceration in late December 2020 and was accepted into a substance abuse treatment program as a condition of his parole. In January of 2021, the court held another dispositional hearing, at which point petitioner's counsel again argued for an improvement period and admitted that petitioner had "random" phone contact with L.C. while he was incarcerated and "would see her when he wasn't in jail from time to time, but he was never there as a regular figure in her life." Counsel also indicated that petitioner was currently employed and speculated that he could, by the end of his six-to-nine-month program, have a place to live. Ultimately, the court denied petitioner's renewed motion for an improvement period based upon his lack of involvement and his inability "to parent [L.C.] or to be a part of her life for seven years." The court also addressed the child's "rocky start in foster homes because of all of the things that she endured in those seven years," finding that "stability right now is clearly a consideration" and that it was not in her best interests to disrupt that stability. At the conclusion of the hearing, petitioner's counsel indicated that petitioner had expressed a desire to voluntarily relinquish his parental rights to L.C. and that she needed to discuss the issue with him. As such, the court continued the hearing.

The court held the final dispositional hearing in March of 2021. The DHHR began by presenting testimony from L.C.'s therapist, who indicated that the child suffered from behavioral and emotional outbursts as a result of her abuse, which necessitated her moving through several foster homes. In regard to petitioner, the therapist testified that when he brought up petitioner, L.C.'s "only response to that was that she knew that he was in jail and didn't really know what for or what that was about, and that was kind of her only knowledge of that." The therapist also indicated that the child did not disclose that she had consistent contact with petitioner, again stressing that the only "feedback that she could give me about her biological father was that he was in jail" and there was even "some confusion about that." When asked about his opinion

concerning possible contact between petitioner and L.C., the therapist declined to make a recommendation because, in the few instances where the child discussed petitioner, "[i]t has all been very—it seemed very indifferent and disconnected." The therapist also agreed that the only person L.C. indicated that she missed was her mother. Additionally, the therapist addressed the issue of the letters petitioner wrote to the child, indicating that he had never been presented with the letters, but recalled discussing them with the DHHR.

The DHHR then presented testimony from a DHHR supervisor, who indicated that the DHHR recommended termination of petitioner's parental rights because of "his lack of having anything to do with" L.C. over the course of "[h]er entire life." The witness reiterated that for the past seven years, L.C. had consistently identified her stepfather as "dad or father." Although L.C. knew that petitioner was her biological father, the witness testified that the child had not shown any bond with him. In addressing whether the DHHR offered petitioner services during the proceedings, the witness testified that petitioner's extended incarceration was partially responsible for an inability to implement such services, such as a psychological evaluation. The witness also indicated that petitioner had not paid child support during the proceedings.

Petitioner then testified and indicated that he was amenable to voluntarily relinquishing his parental rights if he would be permitted to have ongoing contact with L.C. Petitioner also explained that he would require five more months to complete his substance abuse treatment program. Petitioner also admitted that he had not paid child support for three years.

Based on the evidence, the court found that there was no reasonable likelihood that petitioner could substantially correct the conditions of abuse and neglect in the near future and that termination was necessary for the child's welfare. The court found that the child required continuity of care and caretakers, especially because she was "finally stable." According to the court, the evidence showed that the child "was unable to process all of the trauma in her past" and "that is has taken her months to be able to achieve this level of stability where she can perform in school, where she can perform with peers, where she can not have to be on medication." The court noted that it had taken a long time to integrate the child into a stable home environment because of her severe trauma, further demonstrating that termination of petitioner's parental rights was necessary. The court further indicated that "the best we have today is speculation that [petitioner] may be able to care for [L.C.] sometime in the future" and that there was "nothing . . . to demonstrate that that is a proper and fit home that can address her needs." The court noted that petitioner admitted he had not secured proper housing for the child. In regard to the lack of a bond between petitioner and L.C., the court found that the child had "little to no memories" of him. The court also indicated that petitioner "accepted no responsibility for anything that's happened other than he's now seeking substance abuse treatment." According to the court, petitioner blamed others for the problems that occurred with L.C. The court noted that petitioner believed he should have had a relationship with the child based on a prior custody award, but that he never sought to enforce that order. The court stressed that "[t]hose responsibilities are on him" and that petitioner had an obligation to enforce any order pertaining to his right to parent L.C. As the court was announcing its findings, petitioner interrupted and declared "[w]ell, before you take my rights, I'm just going to voluntarily relinquish them." The court, however, rejected petitioner's belated attempt to voluntarily

4

relinquish his parental rights. Ultimately, the court entered its dispositional order terminating petitioner's parental rights.[2] It is from the dispositional order that petitioner appeals.

The Court has previously established the following standard of review:

"Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

At the outset of this Court's analysis of petitioner's assignments of error, it is important to address the fact that petitioner raises no assignment of error on appeal regarding the circuit court's **adjudication** for his failure to support the child emotionally and financially. This is important because throughout his various assignments of error, all of which concern either the court's denial of his motions for improvement periods or the termination of his parental rights, petitioner repeatedly takes issue with the circuit court's findings at adjudication that petitioner failed to provide the child with emotional and financial support. This is curious, because petitioner also admits at several points in his brief that he failed to provide financially for the child and also points to his attempt to stipulate to this condition. Regardless, we find that these arguments are in violation of the West Virginia Rules of Appellate Procedure, which requires that

[t]he brief must contain an argument exhibiting clearly the *points of* fact and *law presented, the standard of review applicable, and citing the authorities relied on . . .* [and] must contain appropriate and specific citations to the record on appeal . . . . The Court may disregard errors that are not adequately supported by specific references to the record on appeal.

W. Va. R. App. P. 10(c)(7) (emphasis added). Additionally, in an Administrative Order entered December 10, 2012, Re: Filings That Do Not Comply With the Rules of Appellate Procedure,

---

[2]The mother's parental rights were also terminated below. The permanency plan for the child is adoption in the current foster home.

the Court specifically noted that "[b]riefs that lack citation of authority [or] fail to structure an argument applying applicable law" are not in compliance with this Court's rules. In that order, the Court went on to instruct that "all of the requirements of the Rules must be strictly observed by litigants" because "[t]he Rules are not mere procedural niceties; they set forth a structured method to permit litigants and this Court to carefully review each case." In ordering that all litigants before this Court must comply with the Rule of Appellate Procedure, the Court cautioned that "[p]ursuant to Rule 10(j), failure to file a compliant brief 'may result in the Supreme Court refusing to consider the case, denying argument to the derelict party, dismissing the case from the docket, or imposing such other sanctions as the Court may deem appropriate.'"

Here, petitioner's brief is inadequate in regard to any potential challenge to the lower court's adjudicatory order. While it is true that petitioner repeatedly asserts that the evidence does not support the court's findings regarding his lack of support, both emotional and financial, petitioner's failure to include these arguments in an assignment of error specifically addressing adjudication is fatal. Indeed, by failing to actually structure a full assignment of error regarding these findings, petitioner has also failed to include the relevant authority governing adjudication in abuse and neglect proceedings, including applicable statutes, rules, and case law. Confusingly, petitioner, at times, makes reference to rules or statutes governing the contents of an abuse and neglect petition, although he similarly does not set forth any assignment of error regarding the sufficiency of the DHHR's amended petition against him. As such, there is simply no way this Court can construe petitioner's repeated references to the court's supposedly deficient findings from the adjudicatory order as a valid assignment of error that complies with Rule 10(c)(7). Because of these failures, petitioner cannot be entitled to relief on any allegations predicated on alleged deficiencies in the circuit court's adjudicatory order.

Turning now to the specific assignments of error before the Court, petitioner argues that it was error to deny his requests for an improvement period. According to petitioner,

[b]oth statute and case law support the idea of allowing a parent to have an improvement period and to take part in developing both a child's case plan and a family case plan that clearly sets forth a plan to substantially correct the problems that lead to the filing of the petition.

In addressing this assignment of error, it is necessary to address the incorrect aspects of this assertion. Improvement periods and case plans are two separate and distinct aspects of abuse and neglect proceedings. The former is discretionary, as this Court has explained that "a parent charged with abuse and/or neglect is not unconditionally entitled to an improvement period." *In re Emily*, 208 W. Va. 325, 336, 540 S.E.2d 542, 553 (2000). The latter, conversely, are required in all cases. W. Va. Code § 49-4-604(a) ("*Child and family case plans*. -- Following a determination pursuant to § 49-4-602 of this code wherein the court finds a child to be abused or neglected, the department shall file with the court a copy of the child's case plan, including the permanency plan for the child. The term 'case plan' means a written document that includes, where applicable, the requirements of the family case plan as provided in § 49-4-408 of this code . . . ."). As such, it is clear from the outset that petitioner has misconstrued the applicable authorities governing these distinct issues. Further, petitioner provides no evidence that he was

precluded from participating in the formulation of any case plan during the proceedings and, therefore, is entitled to no relief on this issue.

Turning to the specific argument regarding his requests for improvement periods, petitioner acknowledges that he was incarcerated at the time he filed his first motion for an improvement period. As such, it is unclear how petitioner believes that he could have established that he was likely to fully comply with an improvement period at that time. It is also important to note that, on appeal, petitioner continues to minimize his abusive and neglectful conduct by arguing that "[i]t is clear from the [a]mended [p]etition and [s]afety plan attached thereto that [petitioner] was not the reason . . . that the [a]mended [p]etition was filed." This argument only underscores petitioner's continued refusal to acknowledge his own conduct that gave rise to the amended petition's filings, which he also demonstrated at several points in the proceedings below. In fact, the court made several findings concerning petitioner's refusal to acknowledge his conduct. While it may be true that other individuals were also alleged to have abused and/or neglected the child, this fact in no way absolves petitioner of his own problematic conduct, such as his failure to provide emotionally and financially for the child, or supports his entitlement to relief on appeal. This refusal also supports the circuit court's denial of petitioner's request for an improvement period. As we have explained,

> [i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted). Without belaboring petitioner's specific arguments regarding the denial of his various requests for an improvement period,[3] the refusal to acknowledge his conduct alone is a sufficient basis for

---

[3]There is one issue that bears addressing in regard to petitioner's arguments in support of an improvement period, not because it entitles petitioner to relief, but because the DHHR's statutory duty to provide reasonable efforts to reunify families is an issue of the utmost importance. Petitioner asserts throughout his brief that the DHHR did not provide him services or otherwise make reasonable attempts to reunify the family. We find that petitioner is entitled to no relief in this regard because the record shows that services were not offered, in large part, due to petitioner's extended incarceration and the fact that the case was ripe for disposition upon his eventual release. According to West Virginia Code § 49-4-604(c)(7)

> For purposes of the court's consideration of the disposition custody of a child pursuant to this subsection, the department is not required to make reasonable efforts to preserve the family if the court determines . . . [t]he parent has subjected the child, another child of the parent or any other child residing in the same household or under the temporary or permanent custody of the parent to

(continued . . . )

denial, and we find no abuse of the circuit court's discretion in denying those motions. *In re M.M.*, 236 W. Va. 108, 115, 778 S.E.2d 338, 345 (2105) ("West Virginia law allows the circuit court discretion in deciding whether to grant a parent an improvement period.").

Next, petitioner argues that his parental rights were terminated upon evidence of conditions of abuse and neglect that were not alleged in the petition, but this argument misstates the record. Petitioner would have this Court believe that the only allegation against petitioner set forth in the DHHR's amended petition was that he was incarcerated. This argument ignores the fact that the DHHR plainly alleged, in addition to the incarceration, that petitioner failed to provide for the child emotionally and financially—to say nothing of his appropriate adjudication for both conditions. In support of this argument, petitioner again raises issues with the sufficiency of the amended petition and his adjudication that are not properly briefed on appeal and, therefore, will not be addressed. Instead, it is sufficient to note that the DHHR's amended petition, while succinct on the topic, plainly alleges that petitioner failed to provide for the child. Further, as set forth above, the court specifically adjudicated petitioner for his failure to provide for L.C., both emotionally and financially. As such, petitioner is entitled to no relief.

---

aggravated circumstances which include, *but are not limited to*, abandonment, torture, chronic abuse, and sexual abuse;

(Emphasis added). Although the circuit court declined to find that aggravated circumstances applied, we nonetheless find that the DHHR was absolved of its duty to make reasonable efforts to preserve the family upon petitioner's release from incarceration because of the evidence of petitioner's extended failure to provide for the child, the lack of a bond between petitioner and the child, and the late posture of the proceedings. While petitioner may be correct that none of the explicitly listed aggravated circumstances apply to this case, the fact remains that this list is non-exhaustive. As such, he is entitled to no relief.

We address this issue, however, to deter the DHHR's inaccurate interpretation of its statutory duty to provide reasonable efforts to reunify families through the implementation of rehabilitative services. Petitioner correctly points out that a DHHR supervisor in this matter testified as follows: "Q: When a respondent . . . is denied an improvement period, is the Department required to provide any services? A: No." The supervisor elaborated that this was "based on the fact that since an improvement period is not granted, . . . there's, essentially, nothing that can be worked on to address the issues that led to the filing of the petition." This is simply incorrect. It appears that the DHHR has conflated its duty to make reasonable efforts to preserve the family, which is mandatory in all cases except those in which aggravated circumstances or other specifically enumerated conditions are present, with improvement periods, which are discretionary. We caution the DHHR to uphold its mandatory duty to seek the reunification of families even absent the granting of an improvement period, as "the over-arching purpose of our abuse and neglect statutory construct continues to be the correction of conditions of abuse and neglect and the return, if reasonably possible, of the children to their homes." *State ex rel. C.H. v. Faircloth*, 240 W. Va. 729, 741, 815 S.E.2d 540, 552 (2018).

Petitioner also argues that the court improperly terminated his rights based upon his past substance abuse and criminal history, which is again unsupported by the record. Petitioner acknowledges that these issues were raised when he answered questions about his incarceration, a condition that contributed to his inability to properly provide for the child and that led to his adjudication. That petitioner's incarceration necessarily implicated these related considerations does not render the circuit court's termination of his parental rights erroneous, as the matter of petitioner's incarceration was squarely before the court. Moreover, petitioner attempts to complain about the introduction of evidence on these issues when it is to his detriment but ignores the fact that he introduced significant evidence related to his substance abuse and past history of domestic violence in his attempts to demonstrate to the court that he would be willing to comply with the terms of an improvement period. Indeed, a cornerstone of petitioner's brief to this Court is his extended participation in substance abuse treatment upon his release from incarceration, a fact that petitioner stresses time and again as indicative of his capacity to improve. Simply put, petitioner cannot pick and choose when this evidence should have an impact on the proceedings and when it should be barred. Therefore, petitioner is entitled to no relief in this regard either.

Next, we note that petitioner spends a significant portion of his argument asserting that the DHHR made unsupported proffers to the circuit court at various hearings in this matter that were highly prejudicial to him. Petitioner fails, however, to cite to the record where he objected to these allegedly incorrect statements. Petitioner further fails to establish that the circuit court accepted these inaccuracies and based any specific ruling upon them. Simply put, petitioner cannot be entitled to relief on appeal simply because he takes issue with statements made by counsel for the DHHR at various hearings without conclusively establishing error in the circuit court's rulings. Petitioner also makes much of certain requests from the DHHR, such as the DHHR's request to find that aggravated circumstances applied to petitioner, in arguing that termination was in error. However, petitioner immediately acknowledges that the court declined to make this finding, thereby undercutting petitioner's argument. Indeed, it is unclear how the circuit court's refusal to grant the DHHR's request and its subsequent lack of findings of aggravated circumstances in reaching disposition could entitle petitioner to relief on appeal. As such, we note that a significant portion of petitioner's arguments on appeal to this Court are, ultimately, irrelevant and do not require analysis.

We turn now to the circuit court's specific findings of which petitioner complains. According to petitioner, the circuit court denied his request for an improvement period upon finding that reunification between petitioner and the child was unlikely "based on the lack of relationship, the lack of involvement that he has had . . . in her life entirely." The court further found that the child "is seven years old and doesn't even refer to him as her father or dad." Petitioner claims that this evidence was rebutted by testimony from several individuals, who stated that petitioner did have contact with the child and that the child did, in fact, refer to petitioner as "dad." We find, however, that the evidence to which petitioner cites is not compelling. According to petitioner, a DHHR worker testified that L.C. called both petitioner and her stepfather "daddy." The evidence to which he cites, however, does not support this position. This worker was asked how, specifically, L.C. referred to petitioner. In response to this question, the worker indicated that he "tried to remember if she even mentioned—I think maybe, on one occasion she mentioned [petitioner] and, I think, she, basically, said he was in jail."

Counsel then inquired again as to how the child referred to petitioner, to which the worker responded, "Well, I think she calls both of them dad. I'm trying to remember because I'm trying to go back months and months and months. I know she mentioned [petitioner] once. I think we were talking about family and she said my dad is in jail." Contrary to petitioner's argument, this testimony is inconclusive as to whether L.C. recognizes petitioner as her father. The only issue that is conclusive from this evidence is that L.C. only referred to petitioner one time during her discussions with this DHHR employee. Ultimately, the issue of the scope of petitioner's relationship with L.C., including whether she referred to the child as her father, is a credibility determination that we decline to disturb on appeal. *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997) ("A reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations."). Contrary to petitioner's arguments on appeal, there is evidence to support the findings of which he complains, although we acknowledge that the court also heard conflicting evidence. However, this is insufficient to entitle petitioner to relief.

It is further important to address petitioner's repeated assertion that the child referring to him as "dad" establishes that a bond existed between him and the child. This is a leap that this Court is simply unwilling to take. Even assuming that the record shows that the child referred to petitioner as "dad," the overwhelming evidence shows that petitioner and the child shared no significant bond, as petitioner had been absent from the child's life for many years. Again, petitioner cites to evidence in support of this assertion that is not compelling. In addition to the testimony cited above, petitioner cites to testimony from L.C.'s therapist that L.C. knew petitioner was her father and was in jail. Indeed, the therapist did testify to these facts, but petitioner omits important context. During the therapist's testimony, he first testified that L.C. described her family by talking about "her mother and her dad," referring to L.C.'s stepfather. The therapist then testified that he brought up petitioner and L.C.'s "only response to that was that she knew he was in jail and didn't really know what for." The therapist was also asked if L.C. ever disclosed that she had consistent contact with petitioner, which the therapist indicated that "[s]he did not" before reiterating that "[a]gain, her only information and feedback that she could give me about her biological father was that he was in jail. She didn't know what for and she had some confusion about that, but there was no other forthcoming information from that." Far from establishing a bond between petitioner and the child, this evidence only underscores the divide between the two, with the therapist describing the child's response to petitioner as "very indifferent and disconnected." Petitioner also cites to testimony from another DHHR employee and asserts that he acknowledged that L.C. knew petitioner was her father. While it is true that this witness testified that L.C. "knows that he's just the biological father," petitioner ignores the fact that when asked if the child "show[s] any . . . reaction or bond" with petitioner "in any way," the witness replied, No." Petitioner also cites to a CASA report, wherein the representative indicated that L.C. "has talked at times about missing her mom, dad, and dad ([petitioner]) but is unable to say what she misses about them." The representative also provided this information in the context of requesting that petitioner have no contact with the child. Further, L.C.'s therapist testified that the only individual that L.C. expressed missing was her mother. Again, while it may be true that the child expressed missing petitioner, the totality of the evidence showed that petitioner and the child did not share a bond.

Further, petitioner makes much of the fact that the evidence showed that he had "some contact" with the child, although it is unclear why he believes this fact is sufficient to overcome the termination of his parental rights. Petitioner would have this Court rule that his sparse attempts to reach the child by phone amount to not only emotional support but also a strong bond. We decline to do so. This distinction is critical because petitioner spends an inordinate portion of his brief asserting that the record contains discrepancies regarding his contact with the child, when, in reality, the evidence is clear that petitioner had not supported the child financially for several years and has such infrequent contact with the child that she had no real memory of him and was indifferent and disconnected when he was mentioned. Simply put, the evidence to which he cites does nothing more than indicate that he often attempted to speak with the child by telephone. This is insufficient to entitle petitioner to relief. While it is true that petitioner had minimal contact with L.C., the record also shows that he had been virtually nonexistent in her life to the point that she referred to her stepfather as "daddy" and had no bond with petitioner. It should also be noted that in support of his argument, petitioner asserts that he had photographs that would establish he was part of the child's life. However, the record shows that these photographs, save one, were not admitted into evidence and, as such, cannot be considered on appeal. Based on the foregoing, petitioner is entitled to no relief in regard to this assignment of error.

Petitioner also cites to his efforts to have contact with L.C. during the proceedings as evidence of his bond with the child. This evidence, however, does not support an existing bond. Further, the record shows that the circuit court permitted the MDT to decide if contact between petitioner and the child was appropriate and it was ultimately determined that it was not in the child's best interests. As such, this evidence is insufficient to establish any bond between petitioner and the child.

Further, petitioner repeatedly asserts that the circuit court's findings have no basis in the evidence and were instead based on unsupported proffer of counsel. This is simply not the case. As explained above, several individuals testified to the lack of a bond between petitioner and the child, and petitioner himself admitted that his visits with her when he was not incarcerated were limited. While petitioner may choose to ignore this evidence in favor of hyperbolic statements about findings predicated on proffer, the record reveals a solid evidentiary basis for the court's findings regarding termination. As we have explained, the DHHR must produce clear and convincing evidence to support dispositional findings. *State v. C.N.S.*, 173 W. Va. 651, 656, 319 S.E.2d 775, 780 (1984) (citation omitted). Here, the record is clear that the DHHR met that burden. To the extent that petitioner believes that his testimony was more credible than that of the DHHR's witnesses, that is yet another credibility determination that we decline to disturb on appeal. *See Michael D.C.*, 201 W. Va. at 388, 497 S.E.2d at 538.

Ultimately, we find no error in the circuit court's termination of petitioner's parental rights. Again, petitioner attempts to parse through the minutia of the circuit court's termination decision while ignoring the fact that he admitted that the main condition of abuse and neglect at issue was not corrected as of the dispositional hearing. Petitioner was originally alleged to be an abusing and neglecting parent, in part, because of his inability to assume custody of the child, a condition for which he was also appropriately adjudicated. At the final dispositional hearing, petitioner admitted that he lacked housing and still could not accept custody of the child. While

11

petitioner attempts to assert that the real condition of abuse and neglect at issue was his incarceration and that he corrected this condition, this argument is obtuse in that it ignores the reality that at no point during the proceedings could petitioner provide the child with a safe and stable home. While petitioner argues that the court erred in finding that there was no reasonable likelihood that he could have substantially corrected the conditions of abuse and neglect in the near future, he again ignores the fact that this finding was based, in large part, on his own admissions at the dispositional hearing. At that time, petitioner admitted that he would require several months in order to complete his substance abuse treatment and, therefore, would be unable to secure housing for the child. Further, the evidence showed that petitioner had been unable to properly provide housing and other support for petitioner for several years, including the three years prior to termination while he was incarcerated several times. Simply put, the record demonstrates an extended history of the conditions persisting. According to West Virginia Code § 49-4-604(d), "'[n]o reasonable likelihood that conditions of neglect or abuse can be substantially corrected' means that, based upon the evidence before the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help." Here, the record shows that petitioner demonstrated such an inadequate capacity, given his admission to a lack of housing and the evidence of his extensive history of failure to provide for the child. Additionally, because this admission serves as a sufficient basis for the termination of petitioner's parental rights, it is unnecessary to address all of the circuit court's findings with which petitioner takes issue.

We similarly find no error in the court proceeding to disposition in March of 2021 instead of imposing a less-restrictive dispositional alternative. Petitioner argues that the court erred in denying his motion at that time upon a finding that his efforts were too late to allow him time to fully correct the conditions of abuse and neglect. This argument, however, is flawed for two important reasons. The first is that in arguing that the circuit court erred, petitioner cites to West Virginia Code § 49-4-605, which dictates the DHHR's mandatory efforts to seek termination and has no bearing on a circuit court. According to that statute,

> (a) Except as provided in § 49-4-605(b) of this code, the department shall file or join in a petition or otherwise seek a ruling in any pending proceeding to terminate parental rights:
>
> (1) If a child has been in foster care for 15 of the most recent 22 months *as determined by the earlier of the date of the first judicial finding that the child is subjected to abuse or neglect or the date which is 60 days after the child is removed from the home*.

W. Va. Code § 49-4-605(a)(1) (emphasis added). Petitioner argues that using either the date of his adjudication or sixty days beyond the child's removal establishes that there was, in fact, additional time for him to demonstrate improvement.

What petitioner ignores, however, is that West Virginia Code § 49-4-610(9) provides that "no combination of any improvement periods or extensions thereto may cause a child to be in foster care more than fifteen months of the most recent twenty-two months." By the time of the March of 2021 dispositional hearing, the child had been in foster care for one year since

petitioner's initial involvement.[4] Further, at that hearing, petitioner testified that he would not be able to even attempt to obtain suitable housing until after he completed his substance abuse treatment, a process that would take five additional months. By petitioner's own testimony, he would not be in a position for the court to evaluate whether returning the child to his care was appropriate until L.C. had been in foster care for seventeen months, beyond the statutory timeframe for improvement periods. Further, although West Virginia Code § 49-4-610(9) permits a circuit court to exceed these timeframes upon "compelling circumstances by clear and convincing evidence that it is in the children's best interests to extend" them, no such evidence existed below. On the contrary, given petitioner's lack of a bond with the child, it is clear that proceeding to disposition was appropriate. As set forth above, the evidence established that petitioner had not provided for the child for many years and was not a significant presence during the first seven years of her life. We have previously noted that

> the early, most formative years of a child's life are crucial to his or her development. There would be no adequate remedy at law for these children were they permitted to continue in this abyss of uncertainty. We have repeatedly emphasized that children have a right to resolution of their life situations, to a basic level of nurturance, protection, and security, and to a permanent placement. The legislature has recognized this by limiting the extent and duration of improvement periods a court may grant in an abuse and neglect case.

*State ex rel. Amy M. v. Kaufman*, 196 W. Va. 251, 257-58, 470 S.E.2d 205, 211-12 (1996). Given petitioner's failure to provide for the child or bond with her, coupled with the evidence of the extremely negative impact the cumulative abuse and neglect had on the child and her difficulty integrating into a stable living situation, we find no error in the court proceeding to disposition.

Next, petitioner argues that evidence of his incarceration was used to support the termination of his parental rights, but that West Virginia Code § 49-4-605(a)(4) "prevents [his incarceration] from being used adversely against him as incarceration is involuntary." Simply put, this is a mischaracterization of that statute and ignores this Court's prior holdings regarding incarcerated parents. First, the statute in question does not preclude a circuit court from considering evidence of a parent's incarceration in an abuse and neglect proceeding. Instead, West Virginia Code § 49-4-605 concerns situations in which the DHHR is required to seek the termination of a parent's parental rights. In that context, the statute states as follows:

---

[4]Petitioner spends a significant portion of his brief arguing that his involvement began in earnest upon the filing of the amended petition in March of 2020, as opposed to earlier in 2019 when he was listed only as a party in interest. It is unnecessary to address these arguments, however, because the analysis above demonstrates that even accepting petitioner's position, the record shows that he could not remedy the conditions of abuse and neglect with the applicable timeframes.

(a) Except as provided in § 49-4-605(b) of this code, the department shall file or join in a petition or otherwise seek a ruling in any pending proceeding to terminate parental rights:

. . . .

(4) If a parent whose child has been removed from the parent's care, custody, and control by an order of removal voluntarily fails to have contact or attempt to have contact with the child for a period of 18 consecutive months: *Provided, That failure to have, or attempt to have, contact due to being incarcerated*, being in a medical or drug treatment or recovery facility, or being on active military duty *shall not be considered voluntary behavior*.

W. Va. Code § 49-4-605(a)(4) (emphasis added). This statute governs the DHHR's actions and in no way limits the ability of a circuit court to consider relevant evidence of a parent's incarceration. This is supported by our prior cases governing incarceration, in which we have explained that "this Court has never held that incarceration cannot be the sole basis for terminating parental rights." *Cecil T.*, 228 W. Va. at 96, 717 S.E.2d at 880. Indeed, the holding of *Cecil T.* explicitly allows for incarceration to be the *sole* factor upon which a court may find that there is no reasonable likelihood that a parent can substantially correct conditions of abuse and neglect when terminating parental rights. *Id.* at 91, 717 S.E.2d at 875, Syl. Pt. 3. Because petitioner's statement of the law is clearly inaccurate, it cannot entitle him to relief.

Ultimately, termination of petitioner's parental rights was appropriate because the evidence supported the circuit court's findings that there was no reasonable likelihood petitioner could substantially correct the conditions of abuse and neglect and that termination was necessary to protect the children. According to West Virginia Code § 49-4-604(c)(6), circuit courts may terminate parental rights upon these findings. As we have explained,

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] . . . that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). Further, we have repeatedly explained that

> "[C]ourts are not required to exhaust every speculative possibility of parental improvement . . . where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and

14

physical development retarded by numerous placements." Syl. Pt. 1, in part, *In re R.J.M.,* 164 W.Va. 496, 266 S.E.2d 114 (1980).

*Cecil T.*, 228 W. Va. at 91, 717 S.E.2d at 875, Syl. Pt. 4. Here, the record shows that the only concrete evidence established that petitioner would be unable to correct the conditions of abuse and neglect in the near future, which seriously threatened the child's welfare as it contributed to her continued instability. The only evidence petitioner cites on appeal to counter this conclusion is his purely speculative testimony that he might successfully complete his substance abuse treatment in the future and then be in a position to perhaps obtain suitable housing and accept custody of the child. As such, we find no error in the termination of petitioner's parental rights.

Finally, petitioner argues that his due process rights were violated by the many errors alleged above. However, having already found that petitioner has failed to establish any such errors, we similarly find no violation of petitioner's right to due process.

For the foregoing reasons, we find no error in the decision of the circuit court, and its May 10, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: January 12, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice Evan H. Jenkins
Justice William R. Wooton